# STATE EX REL. MARVIN KNOTT v. RALPH H. TAHASH.

161 N. W. (2d) 617.

September 6, 1968—No. 40,630.

*Loren W. Sanford* and *Wheeler, Burns & Buchanan,* for appellant.

*Douglas M. Head,* Attorney General, and *Alan M. Schlesinger,* Special Assistant Attorney General, for respondent, warden of State Prison.

Heard before Knutson, C. J., and Nelson, Otis, Sheran, and Frank T. Gallagher, JJ.

OTIS, JUSTICE.

Relator pled guilty to manslaughter in the second degree on September 12, 1958. Because of a prior felony conviction, he was sentenced to a term of 2 to 30 years in prison. On August 16, 1966, he petitioned the district court for a writ of habeas corpus to review his conviction. This appeal is from an order discharging the writ.

The issues raised are as follows: (1) The propriety of the trial court's accepting relator's plea of guilty; (2) whether there was a conflict of interests in counsel's representing two defendants in one proceeding; (3) the competency of his counsel; (4) whether relator was denied a right of allocution; and (5) whether relator was denied a speedy trial.

The circumstances surrounding the offense are necessarily obscure. We have only relator's version given some 8 years after the event and fragmentary accounts presented to the court at the time of sentencing.

Relator is a fullblooded Chippewa Indian, born March 12, 1926, and raised on the Tower Indian Reservation near Lake Vermilion. He received a seventh-grade education at an Indian school. Relator and his brother, Joseph, had been drinking for 2 days prior to May 17, 1958, the date of the offense. At about 2 or 3 o'clock that morning, they were at the home of the decedent, Peter Pete, when a car drove onto the premises. Joseph was then outside. Shortly thereafter, when relator emerged from the house, he heard scuffling. His attention was then attracted to the sound of his brother's shirt being ripped. At that point relator joined the fight.[1]

During the ensuing altercation Peter Pete was knocked to the ground and was severely kicked in the head both by relator and Joseph. As a

---

[1] What followed is gleaned primarily from the report made to relator's trial attorney by a nun from Duluth, one Sister Bernard, who was retained to make an investigation of the facts because of her deep concern for the social conditions which prevailed on the reservation.

result of the beating, Pete bled profusely and was brought into the house by his wife. She was unsuccessful in stemming the flow of blood and abandoned further efforts to care for Pete until approximately 6 o'clock that morning, when she found him dead. Shortly thereafter, both relator and Joseph Knott were arrested and taken into custody.

On May 23, 1958, Marvin and Joseph Knott were arraigned on a charge of murder in the third degree, Minn. St. 1961, § 619.10 (now Minn. St. 609.195). The information, among other things, alleged that defendants did "by acts eminently dangerous to one Peter Pete and evincing a depraved mind regardless of human life, but without premeditated design, to effect the death of said Peter Pete and while engaged in assaulting the said Peter Pete with the hands and feet of said Marvin Knott and Joe Knott and inflicting therewith on the body and person of said Peter Pete grievous bodily injuries, kill the said Peter Pete without legal authority, excuse, or justification * * *."

At the arraignment the court advised defendants it would appoint an attorney to represent them since they were indigent. Bail was fixed at $10,000 and the matter was continued until September 12, 1958. On that date relator was represented by a Duluth attorney, now deceased, who continued to act for him until relator was committed to prison. At that appearance, counsel said he had interviewed both defendants eight or nine times and that they were willing to enter a plea of guilty to manslaughter in the second degree. Minn. St. 1961, §§ 619.18 and 619.26 (now Minn. St. 609.205). The court then said to the defendants: "In effect, you ask the Court to allow you to plead guilty to manslaughter in in the second degree instead of standing trial on murder in the third degree. Do you understand that?" Relator answered, "Yes." When the court repeated the question, however, relator said, "I wouldn't know." Thereupon, the following exchange occurred:

"THE COURT: Your attorney says you want to plead guilty to manslaughter in the second degree rather than stand trial on the charge of murder in the third degree.

"MARVIN KNOTT: Well, there is a few things I want to get straightened up, anyway, stories about this deal.

"[COUNSEL]: I will explain that to the Court in a statement.

"THE COURT: I don't quite understand. You probably know better than I do..

"[COUNSEL]: What we want to do is tell the Court what the background was.

"MARVIN KNOTT: Yes.

"[COUNSEL]: That is true. You will have that opportunity and I will make a statement regarding that.

"MARVIN KNOTT: *I don't want the Court to think I was of a depraved mind.*

"[COUNSEL]: That is the reason you are given a chance to enter a plea to something else. It takes away the 'depraved mind.' Do you understand that?

"MARVIN KNOTT: Yes.

"[COUNSEL]: That is what I want to clear up, and I will explain to the Court what we have done in this investigation and give him the background.

"MARVIN KNOTT: Yes." (Italics supplied.)

Thereafter relator pled guilty to manslaughter in the second degree. The prosecutor then filed a second information charging him with a previous felony conviction under the provisions of the Habitual Offender Act. Relator also pled guilty to having been convicted of that felony.

Counsel explained to the court that the prior conviction was for involuntary manslaughter which resulted from relator's killing a bootlegger with a meat grinder because relator believed he had caused the death of relator's sister.

■ It is the contention of relator that his plea was equivocal and should not have been accepted by the court. We find no merit in this contention. Counsel negotiated a reduction from third-degree murder to second-degree manslaughter. The colloquy quoted above demonstrates that relator's only concern was to avoid the stigma attached to an allegation that the offense evinced a depraved mind. When that element of the crime was deleted, relator expressed satisfaction and acquiesced in entering a plea of guilty to second-degree manslaughter.

■ A more troublesome aspect of the record is the complaint, made with some justification, that relator's attorney did not demonstrate the kind of zealous advocacy expected of counsel for the defense. In addition it is asserted that there was a conflict of interests in one attorney's representing both defendants. Relator seizes on an isolated statement made by counsel, quoted to the court by the prosecutor, to the effect that counsel felt "that the involvement of one of these men, Joe Knott, is perhaps not as extreme or as serious in this matter as that of the other man, because of the other man's previous record." In support of his position, relator cites State v. Martineau, 257 Minn. 334, 101 N. W. (2d) 410. There we held that a conflict of interests arose where one attorney represented two defendants at a single trial because it was in the interest of one defendant that his codefendant testify on his behalf, but contrary to the interest of the other codefendant to do so. Since we do not have that problem here, we hold the case is governed by the rule stated in State v. Robinson, 271 Minn. 477, 136 N. W. (2d) 401, certiorari denied, 382 U. S. 948, 86 S. Ct. 410, 15 L. ed. (2d) 356. There we held that where the interests of the codefendants are not adverse and both adopt the same version of the crime without implicating one another, it is not reversible error for one attorney to represent both in one proceeding.

■ Although relator claims his attorney only interviewed him briefly on two occasions, the record shows that counsel himself represented to the court that he had seen relator between six and nine times in connection with the case. He succeeded in reducing the charge, but necessarily the record does not indicate whether there were valid defenses which might have been interposed, since neither the investigation of the state nor of defense counsel was made a part of the record. We cannot assume there were circumstances attendant upon the death of Peter Pete which would have exonerated relator, although we recognize his inability to make an independent investigation and the necessity for his reliance on his attorney.

■ After the plea of guilty was entered, counsel indulged in a long philosophical discussion, musing aloud on the problems of defendants in particular and Indians in general. He disclosed that there was bad blood between the defendants' family and decedent, and called attention to the

fact that resentment had been generated by many beatings relator's father had endured at Pete's hands. He recited an incident where one of their friends while drunk had been put out of the Pete home on a winter night and was found the next morning frozen to death. In addition, it appears that the Petes had accused Joseph Knott of having illicit relations with their daughter.

While some of these statements by counsel might have revealed a motive for the crime, they were made after the plea of guilty had been entered and only the question of sentencing remained. In effect, counsel pled for a basic understanding of and compassion for the Indian people because of the manner in which the white race had contributed to their degradation. In closing, he indicated Joseph Knott was entitled to consideration without making a similar plea for relator. Relator himself was interrogated briefly as to his background without being specifically invited to speak on his own behalf. He was then given an indeterminate sentence of 2 to 30 years. In the impressions which accompanied the commitment, the court stated:

"Insofar as Marvin Knott is concerned, as the sentence will indicate, he was previously convicted of involuntary manslaughter in Federal Court and served some time in a Federal institution. This is the second killing for him, and the circumstances in the instant case are rather aggravated. You will note, too, that he has a dishonorable discharge from the Air Force, based on desertion, although he had apparently served with a clean record during the period of the Second War, in the Army, without major disciplinary troubles.

"This being his second conviction growing out of the death of a human being, and he being regarded as a disturbing influence on the reservation and by law-enforcement officers as the leader in this particular offense, he should be confined for a long period of time. Post-sentence investigation will go forward to you when completed."

As to the claim that relator was denied a right of allocution, we think the court had before it in imposing sentence an adequate recitation of relator's version of the crime as well as an accurate statement of his general background. Although counsel's presentation in appealing to the

court for leniency may not have been accompanied by the vigor and zeal which today characterize defense counsel's approach in such matters, nevertheless, we find no evidence to support the claim that counsel was indolent or unsympathetic.[2] His representation was not upon this record unconstitutionally inadequate. We therefore hold that relator was not deprived of his right of allocution and is not entitled to be resentenced in the manner set forth in State ex rel. Searles v. Tahash, 271 Minn. 304, 136 N. W. (2d) 70.

■ Finally, relator asserts that the failure to arraign him between May and September 1958 denied him a speedy trial. What we said in State v. Hartman, 272 Minn. 58, 136 N. W. (2d) 543, is applicable here. These defendants should have been assigned counsel and arraigned without delay. We would be better satisfied had relator received credit for the time he was held in jail prior to the commencement of his term. Nevertheless, these are matters which do not bear on his guilt or innocence. Consequently, he was not deprived of any constitutional right which requires a reversal or a discharge. The order discharging the writ of habeas corpus is therefore affirmed.

Affirmed.

---

[2] We have not overlooked a letter dated September 15, 1958, addressed to the trial court by defense counsel, in which he stated among other things the following: "I heartedly [sic] agree with [the prosecutor] as far as the authorities are concerned. They actually would have bent backward to assist the Indians, but as far as the public is concerned, I still feel that they are somewhat different in that they believe the Indian is not much good in relation to those living around him. I believe I am inclined to agree with them as to those Indians living in and around Lake Vermilion Reservation." However, this statement was made 3 days after sentence had been imposed.