STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. GREGORY BELL AND ANTHONY W. PEGUESE, a/k/a TONY ANDERSON, DEFENDANTS-APPELLANTS.

Argued December 14, 1981—Decided July 1, 1982.

164

*Ray J. Barson*, Designated Counsel, argued the cause for appellant Gregory Bell (*Stanley C. Van Ness*, Public Defender, attorney).

*William E. Norris*, Designated Counsel, argued the cause for appellant Anthony W. Peguese (*Stanley C. Van Ness*, Public Defender, attorney).

*Larry R. Etzweiler*, Deputy Attorney General, argued the cause for respondent (*James R. Zazzali*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

Defendants, Gregory Bell and Anthony Peguese, were convicted on four counts involving the breaking and entry of an apartment dwelling in Englewood. Their sole ground of appeal is that they were denied the effective assistance of counsel because they were both represented by public defenders from the same office.

I.

The case has the following background. On December 7, 1978, at about 10:30 a. m., a neighbor heard an apartment being ransacked. Her call brought the police to the scene. Another neighbor coming home saw two men walking down the street

carrying "loads of stuff" in their arms including a pair of bright pink pants on a hanger in a plastic bag, a camera and other equipment. This neighbor noticed the police at the victim's apartment and gave them a description of the burglars. Soon thereafter, the police observed two men who fit this description entering an alley. The police apprehended the two defendants, one as he came out of the alley, and the other in a nearby tavern. Found on Peguese were a bottle of perfume, a watch and a gun. Found on Bell was a camera. A stereo, turntable, tape deck, clock and the pink pants were found in the alley. All of the items, with the exception of the gun and the pink pants, were identified as the tenant's property. When the tenant had her film developed she discovered three photos of the alley, one of which pictured a man identified as Peguese.

Defendants were indicted in five counts for breaking and entering with intent to steal contrary to *N.J.S.A.* 2A:94–1, being armed during commission of same contrary to *N.J.S.A.* 2A:151–5, larceny of goods having a value in excess of $500 contrary to *N.J.S.A.* 2A:119–2, receiving stolen goods having a value in excess of $500 in violation of *N.J.S.A.* 2A:139–1, and possession of a burglary tool in violation of *N.J.S.A.* 2A:94–3.

The trail of the pink pants did not become a significant trial issue until the State's last witness, a detective, described seeing Bell in a diner at 8:00 a. m. with the pants on a hanger. Both defense counsel objected to the use of previously undisclosed testimony about the morning identification and the pink pants. After a recess both defense counsel moved for a mistrial, alleging for the first time a conflict of interest arising from their office association. Their motions were denied. The defendants were found guilty of all counts except receiving stolen goods. The Appellate Division affirmed the convictions. We granted the defendants' petitions for certification limited to the question of whether prejudicial conflict exists simply by reason of defendants being represented by staff attorneys from the same public defender's office. 87 *N.J.* 365 (1981). We now affirm.

## II.

In *State v. Land*, 73 *N.J.* 24 (1977), we held that the defense of a husband and wife against narcotics charges by a single attorney deprived the defendants of the effective assistance of counsel. Justice Schreiber said:

> In our opinion the preferable rule is that, in the absence of waiver, if a potential conflict of interest exists, prejudice will be presumed resulting in a violation of the New Jersey constitutional provision guaranteeing the assistance of counsel. Art. I, par. 10. We believe that this principle accords with the Supreme Court's exegesis of the Sixth Amendment. [*Id.* at 35].

In response to *Land*, we adopted *R.* 3:8–2, effective September 1979, requiring an attorney or law firm to move before trial for permission to represent more than one defendant in a criminal trial.

In *State v. Bellucci*, 81 *N.J.* 531 (1981), we held that pretrial representation of several co-defendants by one attorney prevented the attorney from representing any one of them at trial. In addition, we held it an improper conflict for an attorney to represent one defendant while a partner or associate represents other criminal co-defendants.

In *Bellucci*, the State did not deny the impropriety of such joint representation, but contended that a conviction should not be reversed on the basis of conflict of interest alone, absent a showing of actual prejudice. We disagreed and adhered to the principle stated in *Land* : once a potential for conflict exists, prejudice will be presumed in the absence of waiver even if associated private attorneys are involved instead of the same attorney. *State v. Bellucci, supra*, 81 *N.J.* at 543.

## III.

The question in this case is whether the same potential for conflict exists when the attorneys representing the co-defendants are associates in a public defender's office. We hold that the same potential does not exist and that multiple representation by public defenders does not in itself give rise to a presumption of prejudice. We reach this conclusion because, save one,

the principles and policies that underlay the *Bellucci* holding do not apply here.

In *Bellucci* we set forth three reasons for presuming a conflict where criminal co-defendants are represented by attorneys from the same private law firm. The first is that all firm members typically have access to confidential information. The second is that the entire firm shares an economic interest in the clients of each individual attorney. The third is that "public confidence in the integrity of the Bar would be eroded if conduct proscribed for one lawyer could be performed by his partner." *State v. Bellucci, supra*, 81 *N.J.* at 541.

The second and third reasons for disallowing joint representation by attorneys from the same private firm are closely intertwined. Allowing joint representation by members of the same private firm when the same attorney could not take both cases erodes public confidence primarily because many persons likely will view the two situations as indistinguishable in their benefit to the private firm and its attorneys. Whether one attorney in the firm handles several cases, or several attorneys in the firm each handle one case, the financial benefits to the firm remain the same. In both cases the firm will have an equal incentive to retain defendants as clients in some cases where it disserves the client's interests.

Public interest firms have no financial incentive in retaining the cases of joint defendants who might thereby be prejudiced. As a consequence, the public does not lose confidence in a rule allowing attorneys in the same office to represent joint defendants, even though a single attorney from that office could not handle the cases. Because "the primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State," *Branti v. Finkel*, 445 *U.S.* 507, 519, 100 *S.Ct.* 1287, 1295, 63 *L.Ed.2d* 574, 584 (1980), we can expect the public defenders to withdraw from the case whenever joint representation may prejudice their clients. A *per se* rule requiring counsel from separate offices would there-

fore needlessly deprive many defendants of competent local public defenders.

In *People v. Robinson*, 79 *Ill.2d* 147, 37 *Ill.Dec.* 267, 402 *N.E.2d* 157 (1980), the Illinois Supreme Court recently declined to adopt a *per se* rule of disqualification in cases of multiple representation by a public defender's office. In such instances the Illinois court requires some showing of a conflict of interest before prejudice to the defendant will be found.

We agree and believe this to be the better view, considering all of the factors involved.[1] We are satisfied that although the subtle influences that arise from public defenders practicing side by side in the same office may present difficulties in maintaining absolute independence,[2] "the inbred adversary tendencies of [public defense] lawyers are sufficient protection." *People v. Robinson, supra,* 402 *N.E.2d* at 162 (quoting ABA Standards, The Defense Function, Commentary at 212–213 (1971)).

In so holding, we are conscious that lawyers employed by legal aid societies and similar other public service offices have generally been held to the same standards as private lawyers. Opin-

---

[1]See Lowenthal, "Joint Representation in Criminal Cases: A Critical Appraisal," 64 *Va.L.Rev.* 939 (1978). *But see Allen v. District Court,* 184 *Colo.* 202, 519 *P.2d* 351 (1974) (with an existing conflict of interest between a welfare recipient and a Welfare Department employee, the State Public Defender should not have been *ordered* to defend both against fraud and embezzlement charges); *Turner v. State,* 340 *So.2d* 132 (Fla.Dist.Ct.App. 1976) (public defender's office relieved as counsel for one defendant because of a conflict of interest between his defense and that of another co-defendant); *Commonwealth v. Westbrook,* 484 *Pa.* 534, 400 *A.2d* 160 (1979) (a divided Pennsylvania Supreme Court appeared to adopt a *per se* rule of conflict for public defenders representing co-defendants but the facts of the case demonstrate an actual conflict between two brothers, each of whom was counseled by public defenders from the same office. One brother was charged with the other brother's crime. The latter was counseled by a public defender to refuse to exonerate his brother by admitting guilt).

[2]Thus, if the case requires one public defender to attack the trial competence of a fellow office member, the balance is clearly in favor of outside counsel. *Angarano v. United States,* 329 *A.2d* 453 (D.C.App.1974).

ion 126, 91 *N.J.L.J.* 257 (1968); Opinion 241, 95 *N.J.L.J.* 717 (1972). *Cf.* Opinion 440, 104 *N.J.L.J.* 449 (1979) (law school clinic having prosecutor and defender units must segregate files). See also *Estep v. Johnson*, 383 *F.Supp.* 1323 (D.Conn.1974); *Borden v. Borden*, 277 *A.2d* 89 (D.C.App.1971); *Flores v. Flores*, 598 *P.*2d 893 (Alaska Sup.Ct.1979).[3] For the most part these cases have involved head to head conflict between parties where the issue was actual conflict, not merely the appearance of conflict. Furthermore, and more importantly, the significant policy values at stake here call for standards appropriate to public interest legal practice.

We have repeatedly stressed the importance of the practice of public interest law in our society. *Tp. of Mt. Laurel v. Public Advocate*, 83 *N.J.* 522 (1980). *Cf. In re Education Law Center, Inc.*, 86 *N.J.* 124 (1981) (allowing public corporation with non-lawyer directors to practice law). In *In re Advisory Opinion of Professional Ethics No. 361*, 77 *N.J.* 199 (1978), this Court held that an attorney's employment in a prosecutor's office while certain criminal matters were there pending did not disqualify the private law firm with which he subsequently associated from representing parties in those same matters. So long as the former prosecutor had no actual knowledge of, involvement in or responsibility for the matters, the subsequent acceptance of employment by his law firm would not give rise to an improper conflict. The Court explained:

> ... In balancing the policy considerations in support of the ... view ... that a broad approach to disqualification will adversely affect the ability of government to recruit young professionals and will interfere *with the right of litigants to obtain counsel*, as against the dangers incident to conflicts of interest and the appearance of impropriety affecting public confidence in the bar, we conclude that our approach is the more salutary one. [*Id.*, 77 *N.J.* at 206–07 (emphasis supplied) ].

---

[3]The Alaska court suggested that Legal Services attorneys could properly represent both sides of a civil litigation provided that adequate measures were adopted regarding confidentiality of records, access to files, supervision and physical separation of offices. *Id.*, 598 *P.*2d at 896–97.

While the principles set out in *Bellucci* remain applicable to private attorneys, we hold that there is no presumed or *per se* rule of conflict of interest where deputy public defenders represent multiple defendants.

## IV.

 The above notwithstanding, should the circumstances demonstrate a potential conflict of interest and a significant likelihood of prejudice, the presumption of both an actual conflict of interest and actual prejudice will arise, without the necessity of proving such prejudice.[4] See *State v. Land, supra,* 73 *N.J.* at 24; *cf. State v. Bellucci, supra,* 81 *N.J.* at 547 (Handler, J., concurring in result but disagreeing as to *per se* rule). We must therefore consider the record in this case to see if there was a significant likelihood of prejudice. We find there was not.

Defense counsel saw no conflict prior to trial. There was no *Green* hearing.[5] However, on the third day of trial, the State, without prior disclosure, sought to introduce a detective's testimony regarding his sighting of Bell and the pink pants on the morning of the burglary. Defense counsel claimed surprise but the prosecutor asserted that he had no knowledge of this evi-

---

[4]Federal courts have taken a different approach in this area, holding that only "an actual conflict of interest [that] adversely affected . . . [the] lawyer's performance" would constitute a violation of the Sixth Amendment. *Cuyler v. Sullivan,* 446 *U.S.* 335, 100 *S.Ct.* 1708, 64 *L.Ed.2d* 333 (1980); but see *id.* at 350, 100 *S.Ct.* at 1790, 64 *L.Ed.2d* at 348 (Brennan, J., concurring) (suggesting that a "significant possibility" of conflict creates a presumption of prejudice), and *Wood v. Georgia,* 450 *U.S.* 261, 271–273, 101 *S.Ct.* 1097, 1103–1104, 67 *L.Ed.2d* 220, 230–31 (1981) (an apparent "possibility of conflict" imposes on the trial court a duty to inquire further).

[5]Under *State v. Green,* 129 *N.J.Super.* 157 (App.Div.1974), whenever an instance of dual representation appears, it is appropriate for the court to conduct an inquiry at the earliest convenient time to determine whether or not all defendants thus represented have been fully informed of the potential hazards of such a course and to take appropriate action.

dence until that morning. After a *Wade* hearing,[6] the court ruled the evidence admissible. Peguese's attorney asked for a mistrial on the basis of this ruling or "in the alternative ... for a continuance of just one hour to allow us to drive out to the diner." The court granted that continuance. When the trial resumed the officer's evidence was admitted without further objection. No issue of conflict was presented to the court. Both defense counsel cross-examined the detective. Indeed, it was Peguese's attorney who sharply cross-examined the detective on the fact that his investigative report contained no reference to observation of the pink pants in the diner. Bell's attorney cross-examined briefly and the court recessed for lunch.

Not until the afternoon session, after the cross-examination was completed, did both defense attorneys raise the issue of conflict. They claimed that the conflict had arisen by virtue of the newly revealed dissimilarity in the nature of the State's case against each defendant. They based this claim on the fact that defendant Bell alone, without defendant Peguese, was seen accompanied by his pink trousers several hours before the burglary. No further explanation was given as to how a conflict had developed from this alleged dissimilarity. The court denied the motion for a mistrial.

We fail to see the conflict. The confidentiality of the information was not at issue. The attorney defending Peguese was unfettered in his ability to respond to this new information. Bell could hardly seek to claim a tactical trial problem related to his co-defendant. Its real burden lay not in any conflict but in its surprise. As noted, the trial court permitted an adjournment to allow counsel to check out the incident but denied a mistrial because the nondisclosure was inadvertent. Two privately re-

---

[6]The prosecutor requested the hearing to demonstrate that the officer was able to make an independent identification of Bell and that there were no impermissibly suggestive procedures. *U. S. v. Wade*, 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.2d* 1149 (1967).

tained lawyers would have faced the same problems of trial tactics at that time.

At no time, either at trial or on appeal, have defendants suggested what either trial attorney might have done differently once the conflict arose. Neither defendant took the stand. Peguese's attorney stated that this was his usual trial strategy. Contrast this with *Holloway v. Arkansas*, 435 *U.S.* 475, 98 *S.Ct.* 1173, 55 *L.Ed.2d* 426 (1978), where a trial court had *ordered one* public defender to represent three criminal defendants. He could cross-examine none although their interests differed. *Cf. Glasser v. United States*, 315 *U.S.* 60, 62 *S.Ct.* 457, 86 *L.Ed.* 680 (1942) (attorney representing two defendants voluntarily refrained from cross-examining prosecution witness because of feared adverse effect on one co-defendant).

The Appellate Division found no such encumbered representation here. We agree.

## V.

■ To guarantee maximum confidence in the integrity of the criminal judicial process and to protect rights of defendants, the procedures set forth in *R.* 3:8–2 shall henceforth be followed when multiple defendants are to be represented by separate deputy public defenders from the same office. The court should explore the situation on the record before trial and elicit from counsel an appraisal of any potential for conflict. If defense counsel perceives a potential conflict, this judgment should be accorded substantial deference by the trial court. As the United States Supreme Court observed, "[a]n attorney representing two defendants in a criminal matter is in the best position, professionally and ethically, to determine when a conflict of interest exists or will probably develop in the course of a trial." [7]

---

[7] Of course, such a claim of conflict must be timely made. *Cuyler v. Sullivan, supra,* 446 *U.S.* 335, 100 *S.Ct.* 1708, 64 *L.Ed.2d* 333 (no timely claim of conflict made); *Turner v. State,* 340 *So.2d* 132 (Fla.Dist.Ct.App.1979)

*Holloway v. Arkansas, supra,* 435 *U.S.* at 485, 98 *S.Ct.* at 1179, 55 *L.Ed.*2d at 435 (quoting *State v. Davis,* 514 *P.*2d 1025, 1027 (Ariz.1973)).

The procedure customarily followed by the New Jersey Public Defender—assignment of the defense of co-defendants to outside pool counsel—shall be the norm.[8] Even this has inherent limitations due to the necessity of relying upon a common investigative staff. *Cf. State v. Canery,* 144 *N.J.Super.* 527 (App.Div.1976) (assignment of single investigator to co-defendants with conflicting interests could result in deprivation of right to effective assistance of counsel). The next preferable course is to assign deputy public defenders from an adjoining county. While no one of these alternatives completely eliminates the ongoing relationship between the designated counsel and the public defender's office, a higher degree of independence will obtain. If the only resort to provide counsel to an indigent defendant is within the local office, there must be guidelines in place to guarantee confidentiality and restrict access to individual files.[9]

---

(public defender's pretrial motion for separate counsel should have been granted).

[8]The United States Supreme Court has observed:

Seventy percent of the public defender offices responding to a recent survey reported a strong policy against undertaking multiple representation in criminal cases. Forty-nine percent of the offices responding never undertake such representation. Lowenthal, Joint Representation in Criminal Cases: A Critical Appraisal, 64 Va.L.Rev. 939, 950, and n. 40 (1978). The private bar may be less alert to the importance of avoiding multiple representation in criminal cases. See Geer, Representation of Multiple Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney, 62 Minn.L.Rev. 119, 152–157 (1978); Lowenthal, supra, at 961–963. [*Cuyler v. Sullivan, supra,* 446 *U.S.* at 346, n. 11 [100 *S.Ct.* at 1717] (quoting ABA Project on Standards for Criminal Justice, Defense Function § 3.5(b) (App. Draft 1971)].

[9]See Advisory Committee on Professional Ethics Opinion No. 329, 99 *N.J.L.J.* 433 (1976) (procedures to avoid potential conflict when a government attorney joins a private law firm which represents parties in ongoing litigation involving the attorney's former employer).

We are satisfied that the New Jersey Public Defender is sensitive to the need to appoint outside counsel in cases of potential conflict. *N.J.S.A.* 2A:158A–9, creating his office, provides in pertinent part:

> In any case where the matter involved requires some special experience or skill not available on the professional staff, the Public Defender shall engage counsel on a case basis ... Counsel shall also be engaged on a case basis whenever needed to meet case load demands, or to provide independent counsel to multiple defendants whose interests may be in conflict.

In cases such as this, involving a claim of conflict that arises suddenly in the course of trial, the matter is best left to the trial court's sound discretion.

The judgment of the Appellate Division is affirmed.

HANDLER, J., concurring.

I concur in the result reached by the Court. I agree with the majority that "there is no presumed or *per se* rule of conflict of interest" regarding the representation of multiple defendants by staff attorneys at the same public defender's office. *Ante* at 171.

The majority's opinion has additional significance. In resolving the claims of ineffective assistance of counsel in this case, the Court uses a balancing approach. It holds that a conflict of interest with resulting prejudice to defendants will be presumed only when "the circumstances demonstrate a potential conflict of interest and a significant likelihood of prejudice." *Id.* 171. This holding confirms two salient points. The first is the soundness of a flexible rule for dealing with the prejudicial effects of professional conflicts of interest. The second is the converse of that proposition, namely, the imprudence and wastefulness of a *per se* rule that automatically imputes irrebuttable prejudice from any potential conflict of interest and then mandates reversal of a criminal conviction no matter how fairly founded and free of actual prejudice.

Today's decision is the third in a line of recent opinions by this Court on the subject of multiple representation. In *State v.*

*Land,* 73 *N.J.* 24 (1977), a private attorney had represented codefendants at a criminal trial. In overturning the defendants' convictions, we stressed the fundamental nature of the constitutional right to effective assistance of counsel. The *Land* case presented a conflict of interest that was either actual or generated a substantial likelihood of prejudice. The same attorney represented a husband and wife, each of whom was charged separately with the commission of a joint crime. It is in that particular context that we held: "[I]n the absence of waiver, if a potential conflict of interest exists, prejudice will be presumed." *Id.* at 35.

The *Land* decision was followed by *State v. Bellucci,* 81 *N.J.* 531 (1980), a case in which a private attorney and his partner had represented codefendants at a joint trial. While presented with a less obvious conflict, this Court nevertheless gave the *Land* test a sweeping application and ordered new trials for the defendants. Justice Pashman, writing for the majority, stated that "once a potential conflict exists, prejudice will be presumed in the absence of waiver." 81 *N.J.* at 543.

What emerged from the *Bellucci* decision was a *per se* rule against multiple representation that established an irrebuttable presumption of prejudice to the defendant and mandated the reversal of an otherwise sound criminal conviction simply because of the existence of a potential conflict of interest. I wrote separately in that case because I found the majority's solution to the problems posed by multiple representation in criminal cases to be far too extreme. The Court's methodology for dealing with multiple defendant representation required the judicial cancellation of otherwise fair criminal trials.

In my estimation, these kinds of problems can be handled through a more tempered approach, which is entirely consonant with the constitutional interests that are implicated. In the absence of an actual conflict of interest, prejudice need be presumed only "where a potential conflict of interest is shown under circumstances generating a strong likelihood of actual

prejudice to the defendant." 81 *N.J.* at 547. This remedy accords a defendant sufficient constitutional protection without unnecessarily sacrificing the public's strong interest in properly conducted, and concluded, criminal trials.

The instant case illustrates the soundness and workability of such an approach. In this case staff attorneys in the same public defender's office represented individual codefendants against criminal charges relating to the same criminal events or transactions. The entire Court—including the dissent—recognizes that the potential for conflicts of interest in this situation is comparable to the representation of multiple defendants by private attorneys who are members of the same law firm. I agree with this assessment. Each of these situations is fraught with professional conflicts which potentially jeopardize the criminal defendant's constitutionally protected right to effective assistance of counsel. See *Bellucci*, 81 *N.J.* at 531; *Land*, 73 *N.J.* at 24; *Cuyler v. Sullivan*, 446 *U.S.* 335, 100 *S.Ct.* 1708, 64 *L.Ed.*2d 333 (1980).

Nevertheless, in this case the Court refuses to presume actual prejudice and does not apply a *per se* rule of reversal. *Ante* at 167. The Court here uses essentially the same flexible approach that I urged in *Bellucci*. It recognizes the potential for prejudice inherent in the multiple representation of defendants by associated attorneys and then engages in a factual inquiry to determine whether actual or likely prejudice resulted from such multiple representation. Significantly, the Court ultimately determines that there was no actual or probable prejudice demonstrated in this case and, therefore, no reversible error. *Ante* at 171, 172–173.

The Court also recognizes that while in this case it was confronted merely with a potential conflict, "should the circumstances demonstrate a potential conflict of interest and a significant likelihood of prejudice, the presumption of both an actual conflict of interest and actual prejudice will arise, without the necessity of proving such prejudice." *Ante* at 171, 172–

173. In my view, the Court's general analysis and conclusions are eminently sound. My only difference with the majority concerns its continued adherence to a *per se* rule in regard to multiple representation by private attorneys. *Ante* at 171. Its reasons for doing so are not satisfactory.

The Court departs from the automatic reversal rule of *Bellucci* in this case because the potential for conflict in a public defender's office is more attenuated than in a private law firm. This reason is really nothing more than a pretext. I agree with Justice Pashman, who dissents on the ground that there is no material difference between public and private attorneys in terms of the potential conflict and prejudice. *Ante* at 167–169. Because these situations are sufficiently similar, Justice Pashman criticizes the majority for refusing to apply the *Bellucci per se* rule in this context. I criticize the majority for refusing to repudiate the *Bellucci* rule.

Despite its reaffirmance of *Bellucci*, the majority's determination today can only be construed as a significant, albeit implicit, modification of its *per se* rule of automatic reversal. At the very least, however, the Court's adoption of a different approach for public defenders, as opposed to private attorneys, exposes the weaknesses of its *per se* rule.

An assumption underlying the Court's decision is that there is a conflict of interest—to some degree—presented by the public defender's representation of multiple defendants. The Court obviously considers the degree of potential conflict of interest to be more than *de minimis*. Otherwise, there would be no reason for its inquiry into whether there was "a significant likelihood of prejudice" caused by the conflict, however characterized. *Ante* at 171.

Stripped to its essence, the Court's opinion must be understood to hold that, whenever there is simply a potential for conflict, an inquiry into actual prejudice or the substantial likelihood of prejudice to a defendant's right to effective assistance of counsel should be undertaken. While the presence of an actual

conflict of interest or a conflict generating a substantial likelihood of actual prejudice, such as in *Land,* permits the imputation of prejudice, the Court's opinion today demonstrates that where the conflict is not patent, an inquiry into actual or likely prejudice should be undertaken unless the asserted conflict is truly *de minimis.*

Here, the factors that distinguish multiple representation by public defenders from multiple representation by private attorneys influence only the *degree* of the potentiality for conflicts of interest, not the existence *vel non* of such conflicts. The same concern for clients' rights which we stressed in the *Bellucci* opinion presents itself with equal force whether the lawyers involved work at the same private law firm or the same public defender's office. 81 *N.J.* at 541. See also *Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 *F.*2d 1311, 1321 (7 Cir. 1978), *cert.* den., 439 *U.S.* 955, 99 *S.Ct.* 353, 58 *L.Ed.*2d 346 (1979). Logic, as well as sound policy, dictate that if all that is reasonably required in the one situation to protect a defendant's rights is a factual inquiry into prejudice, that is all that need be undertaken in the other.

In our eagerness to fashion strong rules for governing the handling of professional conflicts of interest in multiple defendant criminal trials, we can easily smother our objective. By formulating absolute rules that are so extreme and inflexible, we may be forfeiting other significant values in the administration of criminal justice. The polestar of the criminal justice system remains the fairness of the trial and the justness of the verdict. See *State v. Singletary,* 80 *N.J.* 55, 64 (1979); *State v. Deatore,* 70 *N.J.* 100, 105 (1976). I submit that a *per se* rule that requires the automatic reversal of a well-founded criminal conviction is self-defeating nullification of the criminal process. By clinging to its automatic reversal rule, the Court appears "to strain at a gnat and swallow a camel." *Holy Bible,* Matthew 23:24 (King James Version).

I do not gainsay the constitutional mischief that can arise in the unsupervised and uncorrected representation of multiple defendants. After a trial has been concluded, however, the focus must be on the nature, quality and degree of harmful prejudice suffered by a defendant as a result of multiple representation. It is only when a convicted defendant has suffered harmful injury to constitutional rights that he is entitled to another trial. See *Chapman v. California*, 386 *U.S.* 18, 87 *S.Ct.* 824, 17 *L.Ed.2d* 705 (167), reh. den., 386 *U.S.* 987, 875 *S.Ct.* 824, 17 *L.Ed.2d* 705; *State v. Macon*, 57 *N.J.* 325 (1971). The Supreme Court has sharpened this focus in *Cuyler* by positing as the standard for reversal of a conviction "an actual conflict of interest [that] adversely affected . . . [the] lawyer's performance." 446 *U.S.* at 348, 100 *S.Ct.* at 1718, 64 *L.Ed.2d* at 346–47.

Concededly, there are situations where the prejudice is not provable but, under the circumstances, is so patent or likely that a defendant should not be required to demonstrate the actual impairment of his constitutional rights. However, in the broad middle ground between a *de minimis* conflict and an actual conflict, where the existence of neither an actual conflict nor real prejudice is obvious, a more flexible standard can adequately protect the constitutional rights of the criminal defendant to effective assistance of counsel without requiring the needless reversal of otherwise valid criminal convictions. See, *e.g., Wood v. Georgia*, 450 *U.S.* 261, 270–72, 101 *S.Ct.* 1097, 1103–04, 67 *L.Ed.2d* 220, 230–31 (1981) (an apparent "possibility of conflict" imposes on the trial court a duty to inquire further); *Cuyler*, 446 *U.S.* at 350, 100 *S.Ct.* at 1719, 64 *L.Ed.2d* at 348 (Brennan, J., concurring) (a "significant possibility" of conflict creates a presumption of prejudice); *Bellucci*, 51 *N.J.* at 546, 547 (Handler, J., concurring) (a presumption of prejudice will arise where potential conflict of interest generates "a strong likelihood of actual prejudice").

It is hardly surprising, therefore, that this Court's automatic reversal rule seems to stand alone, suggesting that it may indeed be aberrational. I am aware of no other jurisdiction that

has opted for a *per se* rule requiring the automatic reversal of otherwise valid criminal convictions without a showing of actual or even probable prejudice. It does not appear that any other jurisdiction has adopted this absolutist approach to multiple representation situations when only a potential conflict of interest is presented. See, *e.g.*, *Cuyler*, 446 *U.S.* 335, 100 *S.Ct.* 1708, 64 *L.Ed.2d* 333; *United States v. Lawriw*, 568 *F.2d* 98 (8 Cir. 1977), *cert.* den., 435 *U.S.* 969, 98 *S.Ct.* 1607, 56 *L.Ed.2d* 60 (1978); *Haggard v. Alabama*, 550 *F.2d* 1019 (5 Cir. 1977); *Houston v. State*, Ala.App., 401 *So.2d* 270 (1981); *Sullivan v. State*, Alaska, 509 *P.2d* 832 (1973); *State v. Rogers*, 110 *Ariz.* 582, 521 *P.2d* 1128 (1974); *People v. Cook*, 13 *Cal.3d* 663, 532 *P.2d* 148, 119 *Cal.Rptr.* 500, *cert.* den. 423 *U.S.* 870, 96 *S.Ct.* 135, 46 *L.Ed.* 2d 100 (1975); *People v. Romero*, 189 *Colo.* 526, 543 *P.2d* 56 (1975); *Palmer v. Adams*, 162 *Conn.* 316, 294 *A.2d* 297 (1972); *Isijola v. State*, Del., 340 *A.2d* 844 (1975); *Hall v. United States*, D.C.App., 236 *A.2d* 57 (1967); *State v. Youngblood*, Fla., 217 *So.* 2d 98 (1968); *Wright v. State*, 158 *Ga.App.* 494, 280 *S.E.2d* 896 (1981); *Pulver v. State*, 93 *Idaho* 687, 471 *P.2d* 74 (1970); *People v. Durley*, 53 *Ill.2d* 156, 290 *N.E.2d* 244 (1972); *Martin v. State*, Ind., 314 *N.E.2d* 60, reh. den., Ind., 317 *N.E.2d* 430, *cert.* den., 420 *U.S.* 911, 95 *S.Ct.* 833, 42 *L.Ed.2d* 841 (1974); *Jackson v. Aiger*, Iowa, 239 *N.W.2d* 180 (1976); *State v. Sullivan*, 210 *Kan.* 842, 504 *P.2d* 190 (1972); *Ware v. Commonwealth*, Ky., 537 *S.W.2d* 174 (1976); *State v. Johnson*, La., 406 *So.2d* 569 (1981); *Gayton v. Robbins*, Me., 272 *A.2d* 776 (1971); *Commonwealth v. White*, 362 *Mass.* 193, 285 *N.E.2d* 110 (1972); *State ex rel. Knott v. Tahash*, 281 *Minn.* 305, 161 *N.W.2d* 617 (1968); *Mooring v. State*, Mo., 501 *S.W.2d* 7 (1973); *State v. Jeffrey*, 163 *Mont.* 92, 515 *P.2d* 364 (1973); *Patterson v. State*, 81 *N.M.* 210, 465 *P.2d* 93 (Ct.App. 1970); *People v. Crump*, 53 *N.Y.2d* 824, 422 *N.E.2d* 815, 440 *N.Y.S.2d* 170 (1981); *State v. Oliver*, 23 *Ohio App.2d* 210, 262 *N.E.2d* 424, 52 *Ohio Op.2d* 308 (1970); *Jones v. State*, Okl.Cr., 527 *P.2d* 169 (1974); *State v. Austin*, 84 *S.D.* 405, 172 *N.W.2d* 284 (1969); *Combs v. Turner*, 25 *Utah* 2d 397, 483 *P.2d* 437 (1971); *State v. Meyers*, 86 *Wash.2d* 419, 545 *P.2d* 538 (1976); *State ex*

*rel. Postelwaite v. Bechtold, W.Va.*, 212 *S.E.*2d 69 (1975); *State ex rel. White v. Gray*, 57 *Wis.*2d 17, 203 *N.W.*2d 638 (1973).

The Court's conclusion in this case confirms the desirability of a flexible rather than an absolute rule. Such an approach in no way minimizes the importance of the underlying constitutional right. See *Land*, 73 *N.J.* at 24. Indeed, the Court's opinion provides clarity and direction in resolving these matters. *Ante* at 174–175. There is a need for strong rules to deter conflicts of interest that threaten the right to effective assistance of counsel. These rules should, whenever possible, be invoked prior to trial and, if need be, before the conclusion of a trial. Properly followed and applied, such rules should suffice to assure defendants effective assistance of counsel, without the uncritical resort to the automatic imputation of prejudice and the concomitant reversal of criminal convictions.

By following a balanced approach in this case, the Court has demonstrated that a flexible rule in multiple representation situations is feasible. Its decision illustrates that a judicial inquiry can properly be made to ascertain the nature of any asserted professional conflicts of interest and the extent of actual or probable prejudice to defendants' rights engendered by that conflict. This approach better serves the fair, efficient and expeditious administration of criminal justice than does a *per se* rule that leads to automatic reversals of criminal convictions. I therefore urge the Court to extend this approach to multiple representation cases in general, rather than limit the holding to public defender cases.

PASHMAN, J., dissenting.

The issue in this case is whether the representation of co-defendants by public defenders from the same office denies them effective assistance of counsel. In *State v. Land*, 73 *N.J.* 24 (1977), this Court held that representation of co-defendants by a single attorney was unconstitutional absent a valid waiver. Justice Schreiber, writing for a unanimous court, set forth our

strong policy of avoiding even the possibility of conflicts of interest in the representation of co-defendants. In *State v. Bellucci*, 81 *N.J.* 531 (1980), the Court held that representation of co-defendants by two members of the same private law firm created a similar potential for conflict and therefore constituted a denial of effective assistance of counsel. Absent a knowing waiver, such joint representation is therefore prohibited. The majority here refuses to apply the same rule to public defenders from the same office. They believe that the salutary safeguards they have implemented to prevent actual conflicts, *ante* at 173–175, provide sufficient protection. In my view, extension of the *Bellucci* rule to public defenders is necessary to eliminate the danger of conflicts of interest. I therefore dissent.

I agree with the majority that public interest attorneys and private attorneys should not automatically be treated the same way. Certain rules appropriate to one may be unnecessary or counterproductive when applied to the other. *See, e.g., In re Education Law Center, Inc.*, 86 *N.J.* 124 (1981) (allowing non-profit corporation with non-lawyer directors to practice law). The proper approach is to inquire into the appropriateness of applying the particular rule in question to public interest practice. Unlike the majority, I believe that anything short of applying the *Bellucci* rule to public defenders will not "protect adequately the 'fundamental and absolute' right to effective assistance of counsel." *State v. Bellucci*, 81 *N.J.* at 543 (citation omitted).

The majority's approach centers around a hearing early in the proceedings to determine whether there is any potential for conflict. *See R.* 3:8–2. If so, joint representation will be prohibited. If defense counsel perceives a potential conflict, the trial court is urged, though not required, to defer to that judgment. There are two problems with that solution. First, it leaves open the danger that a conflict will be discovered later in the proceedings, perhaps during the trial. Second, it does nothing to address the fear some defendants may have of revealing confidences to an attorney associated with the attorney for their

co-defendants. The *Bellucci* rule would fully eliminate both problems.

Conflicts of interest will not always be evident at the time of the pre-trial hearing. As Justice Schreiber pointed out in *State v. Land*, 73 *N.J.* at 32, "[a]lthough not apparent, the conflict may surface during the course of the trial." The facts of this case underscore that possibility. At the last minute, the State discovered and introduced a witness whose testimony was damaging to only one of the co-defendants. Although I do not dispute the majority's finding that there was no actual prejudice here, it is easy to see how on slightly different facts the introduction of such a witness could create a conflict.

If a conflict is discovered during or immediately before trial, the defense and the court are faced with two unacceptable alternatives. The first possibility is that they may choose to tolerate the conflict rather than change attorneys. Defense counsel who has put considerable work into a case may hesitate to see that work go to waste and burden an equally busy neighboring public defender office with a duplication of effort. A defendant who has confided in and learned to trust his attorney may view the conflict of interest as the lesser evil when faced with the prospect of a new attorney. Finally, especially during trial, the trial court may view a defense motion for a change in attorneys as an attempt to stall or disrupt the trial. Its inclination may therefore be to deny the motion. In each case, the result will be ineffective assistance of counsel.

The alternative is to change attorneys in midstream. This is equally unacceptable. At best, such a change would require substantial time and resources for the new attorney to familiarize herself with the case. The trial would have to be delayed during this time or, if the trial had already begun, a new trial might be necessary. Often, the result may be even worse. A new attorney may be appointed and required to proceed immediately with the case, without the opportunity to do much investi-

gation, study the files of the prior attorney, or even talk with her client.

This solution will also have an adverse impact on the defendant's perception of the criminal justice system. He will be forced to change attorneys in the middle of his case. Any confidence he has gained in his attorney, any feeling that he can trust and confide in her, will be dissipated. He will be forced to reveal difficult and personal facts about himself to still another stranger. People close to the criminal justice system are well aware that one prevalent complaint of criminal defendants is that they have been shunted from attorney to attorney during the course of their case. Without an opportunity to develop any sort of rapport with their attorneys, defendants often feel that they have not had an adequate opportunity to present a defense. Often, they will be right. Such shuffling is certainly inconsistent with the type of individualized attention and zealous advocacy that our criminal justice system purports to provide defendants. That the majority's rule will unavoidably increase the shuffling of appointed defense attorneys is alone sufficient reason to reject it.

The second difficulty with the majority's rule concerns client confidences. I assume that hardly ever would a public defender reveal her client's confidences to another public defender in the same office representing a co-defendant. Even so, the defendant's perception that his attorney will share information with an associate can damage the attorney-client relationship almost as much as the actual revelation of such information. We have said that "the right to counsel 'would be meaningless if the defendant were not able to communicate freely and fully with the attorney.'" *State v. Land*, 73 *N.J.* at 30, quoting M. Freedman, *Lawyers' Ethics In An Adversary System* 8 (1975). Such open communication will not occur if the defendant believes that his secrets will not be safe, whether or not that belief ·is justified.

The facts of *State v. Rogers*, 90 *N.J.* 187 (1982), decided today, illustrate the problem. The defendant there believed that anything he said to his attorney would be disclosed to the attorney for his co-defendant. He therefore refused to discuss his case with his attorney. The trial court determined that his fears about confidentiality were unfounded and therefore denied his motion for a new trial. However, the question is not whether his fears were justified. Whether or not they were justified, they were real. Given those fears, defendant could not communicate with his attorney. Since he was not given an attorney he felt he could trust, he was denied effective assistance of counsel.

The right to independent counsel is fundamental. As we explained in *Bellucci, supra* :

> The harm in dual representation is caused by the restraints placed on an attorney's advocacy and independent judgment. It is one of divided loyalties. At its extreme, such conflict may prevent counsel from attempting to exonerate one client when doing so would require him to demonstrate that another client is guilty. [81 *N.J.* at 543]

The majority offers no reason why co-defendants need be represented by public defenders from the same office despite the potential for conflict. Any savings in resources from the majority's rule likely will be outweighed by the added expense and duplication of effort that will result from changing attorneys in midstream as conflicts arise. In any event, convenience and reduction of administrative costs cannot justify deprivation of the effective assistance of counsel.[1] In some situations, the defendants may be better served by being represented by associated public defenders. In those cases, they are free to waive their constitutional right to independent counsel. *Johnson v. Zerbst*, 304 *U.S.* 458, 58 *S.Ct.* 1019, 82 *L.Ed.* 1461 (1938); *State v. Land*, 73 *N.J.* at 32.

---

[1] I understand that the financial costs of extending the *Bellucci* rule are not negligible. For that reason, whenever possible, co-defendants should be represented by public defenders from neighboring municipalities rather than by pool counsel. In this way, there will be no additional fees.

My disagreement with the majority is not at the level of principle. We all agree that the constitutional right to effective assistance of counsel deserves careful protection. The majority believes that their rule will adequately protect that right. I disagree. In my view, application of the *Bellucci* rule to public defenders from the same office is necessary to assure defendants their fundamental right to independent counsel.

HANDLER, J., concurring in the result.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*Dissenting*—Justice PASHMAN—1.