# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01109-COA

**TYKEVIOUS DURR A/K/A TYKEVIOUS TYRONE DURR**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/01/2021 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN T. COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA ROSENBLATT |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/09/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.    On September 8, 2020, a Forrest County grand jury indicted Tykevious Durr, a/k/a Tykevious Tyrone Durr, in Count I for conspiracy to commit armed robbery of Tomaka Jones, in Count II for the capital murder of Tomaka Jones, in Count III for the armed robbery of Marlena Owens, and in Count IV for the aggravated assault of Marlena Owens.  After a jury trial from June 21 through June 24, 2021, Durr was convicted of all four counts. The circuit court sentenced Durr for Count I to five years in the custody of the Mississippi Department of Corrections (MDOC), for Count II to life imprisonment in the custody of MDOC without eligibility for parole, for Count III to twenty-five years in the custody of

MDOC, and for Count IV to twenty years in the custody of MDOC. The sentences were ordered to run consecutively with one another. Durr appealed.

## FACTS AND PROCEDURAL HISTORY

¶2. On November 26, 2018, Marlena Owens and her boyfriend, Tomaka Jones, were living together at 230 Oak Street in Hattiesburg. They contacted Konswaylo Durr (Konswaylo) and asked her to go with them to Prentiss to buy drugs. They knew Konswaylo was from that area and knew her way around it. So the three of them, with a male named Theo, got together and traveled to Prentiss. When they reached their destination, Jones and Konswaylo got out of the car and approached a male who was standing outside the residence. Jones bought drugs from the male and got back into the car. Konswaylo followed the unnamed male into the residence. Owens, Jones, and Theo waited for Konswaylo outside the residence for twenty to thirty minutes and then decided to return to Hattiesburg without her. On the trip back, Owens discovered Konswaylo had left her purse in the vehicle. They took the purse to Konswaylo's residence at Plantation Apartments and left it with her mother. Jones then dropped off Owens at their residence and left to take Theo home.

¶3. After discovering that the others had left, Konswaylo called her boyfriend, Andre Snell, to come get her. Snell had to leave work to drive to Prentiss and take Konswaylo back to Hattiesburg. Upon their return, they went directly to Owens's residence to retrieve Konswaylo's purse. When they arrived, Jones had not returned to the residence. Konswaylo was angry because she was left in Prentiss, and they had taken her purse. Snell was angry because he had to take off work to get Konswaylo. Owens would not open the door to the

2

residence, and an argument occurred with Konswaylo and Snell standing outside the residence. While the argument was ongoing, Owens called Jones and told him to hurry home. When Konswaylo and Snell realized that Owens was telling them she had left the purse with Konswaylo's mother, they left the residence.

¶4. Jones arrived at the residence shortly thereafter. Owens told him what had transpired, and he called Konswaylo and Snell. Obviously disturbed by the phone call, Konswaylo and Snell returned to confront Owens and Jones. This time, inside the residence, all four became engaged in a heated argument. The women were confronting each other, and the men were confronting each other. Snell demanded gas money from Jones because he had to drive to Prentiss to get Konswaylo, but Jones refused. According to Snell, Jones pulled a knife on him, and they left. However, as they were leaving, Snell told Owens and Jones that he would be back.

¶5. When they got back to Plantation Apartments, Snell discussed the day's events with Durr, who is Konswaylo's son. Snell admitted that he was still mad because Jones had pulled a knife on him. Snell testified that he and Durr decided to go back that night and rob Jones. Durr left the apartments for a time and returned with Jordan Woods, a/k/a Jay, and Tomaz Hinton, a/k/a Bino. Later, Snell, Durr, Hinton, and Woods left Plantation Apartments together. They dropped off Woods at Eagle Flat Apartments and then, with Durr driving, proceeded to the residence of Owens and Jones. Snell, Durr, and Hinton parked around the corner from the house, raised the hood of the car, and turned on the flashers to make it appear they were having car trouble. While there is conflicting evidence as to what happened next,

3

considering the evidence in the light most favorable to the verdict,[1] all three exited the vehicle and approached the residence. At that time, Snell had a .380-caliber handgun and Durr had a 9 mm handgun.

¶6.    According to Hinton, once the three approached the residence, he picked up a cinder block and tried to break the glass on the sliding-glass back door. Although the glass did not break, it made a loud noise, and he heard a lady scream. He then joined the other two on the side of the residence. He heard a man come to the door and tell the female to get his gun. According to Hinton, that is when Durr started shooting at Jones, who was standing outside the residence on the porch. Hinton testified that Jones then ran back into the house, with Durr and Snell following him inside. Jones ran into the bathroom area and was in the bathtub when Hinton saw Durr stand over him and shoot him several more times. Hinton says that Owens was also in the bathroom and got shot a few times as well. Hinton never saw Snell shoot his gun, but Hinton did see Snell hit Owens "upside the head with the gun." Hinton said they grabbed the cell phones and ran out of the house. After they left, Owens was able to contact law enforcement for help.

¶7.    Owens testified at trial and described the events of the day and the attack she endured that evening inside her residence. Although she could not identify the shooter, she was able to state that the shooter had on Adidas pants.

¶8.    Testimony from law enforcement and the State's experts showed that five 9 mm

---

[1] "Our role as [an] appellate court is to view the evidence in the light most favorable to the verdict." *Little v. State* 233 So. 3d 288, 289 (¶1) (Miss. 2017). *See Williams v. State*, 351 So. 482, 489 (¶23) (Miss. Ct. App. 2022) ("[A]ny conflicts in the witnesses' testimony were ordinary issues of weight and credibility for the jury to decide.").

caliber shell casings were found at the residence and that all these casings were fired from the same weapon. Four bullets were also recovered: two from the body of Jones, one from the body of Owens, and one from the bathroom floor. All four were identified as 9 mm caliber and found to have been fired from the same weapon. Jones died as a result of two lethal gunshot wounds.

¶9. The testimony and video evidence admitted at trial showed that Durr was wearing Adidas pants on the night of the murder. Further, a video interview of Durr was admitted into evidence. This lengthy interview took place at the police station soon after the shootings. Durr repeatedly denied knowing anything about the shootings and denied having ever been to Owens's residence. Ultimately, however, Durr gave a written statement during the interview and explained that he did in fact go to Owens's residence with Snell and Hinton to rob Jones. He admitted that he was present when the shootings began but contended he neither had nor fired a weapon.

¶10. Durr was indicted, tried, and convicted for conspiracy to commit the armed robbery of Tomaka Jones, for the capital murder of Tomaka Jones, for the armed robbery of Marlena Owens, and for the aggravated assault of Marlena Owens. Durr appeals and raises two assignments of error, which we will address separately below.

**ANALYSIS**

I. **Were Durr's Sixth Amendment rights violated when public defenders from the same office represented him and his two co-defendants, who both testified against Durr?**

¶11. At trial, Durr was represented by appointed counsel Alex Ignatiev from the Forrest

5

County Public Defender's Office. Even though the State had elected not to seek the death penalty, Ignatiev filed a motion for the appointment of an additional attorney to represent Durr. Durr was still facing a possible sentence of life imprisonment without eligibility for parole for the charge of capital murder, and Ignatiev argued that due to the complexity of the case, an additional attorney was needed to assist in Durr's defense. Ignatiev explained that ordinarily another attorney in the public defender's office would assist him, but all the other attorneys in the office had been appointed to represent Durr's co-defendants. Further, Ignatiev advised the court that Hinton and Snell had both pled guilty and that they were expected to testify against Durr at trial. At that time, Ignatiev was not sure as to the status of Konswaylo's case. Ignatiev advised the circuit court that he had spoken with Joshua Stiglet, a former Forrest County Public Defender, who indicated that he would be ready, willing, and able to assist in Durr's defense. On February 1, 2021, the circuit court entered an order appointing Stiglet as additional counsel for Durr. Stiglet appeared as counsel for Durr and participated in Durr's trial on June 21-24, 2021.

¶12.    At no point was an issue raised by the circuit judge, Durr, or either of his counsel as to whether Ignatiev could effectively represent Durr. It is clear that they all knew well in advance of trial that other attorneys from the public defender's office were representing Durr's co-defendants and that at least two of the co-defendants would likely appear at trial to testify against him. For the first time on appeal, new appellate counsel from the Office of State Public Defender, Indigent Appeals Division, contends that because Ignatiev had an "actual" conflict of interest, his representation of Durr under these circumstances was a

6

violation of the Mississippi Rules of Professional Conduct and a violation of Durr's right to effective assistance of counsel pursuant to the Sixth Amendment to the United States Constitution.

¶13. The analysis required in reviewing "conflict of interest" claims was recently addressed by this Court in *Magee v. State*, 349 So. 3d 734, 742-43 (¶¶17-18) (Miss. Ct. App. 2022), where we explained:

> "Conflict-of-interest claims involving attorneys in criminal cases are a species of ineffective assistance of counsel under the Sixth Amendment." *Galloway v. State*, 298 So. 3d 966, 974 (¶43) (Miss. 2020) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984) ("Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest.")). "Such claims are evaluated under one of two separate standards: the *Strickland* standard or the standard from *Cuyler* [*v. Sullivan*, 446 U.S. 335 (1980)]." *Id.* (citing *Crawford v. State*, 192 So. 3d 905, 917-18 (Miss. 2015)). The *Strickland* standard requires a showing that counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 688. The *Cuyler* standard is less burdensome and presumes prejudice when a claimant shows an actual conflict of interest adversely affected his counsel's performance. *Cuyler*, 446 U.S. at 345-50.

> "When the accused is represented by an attorney with an actual conflict of interest, the accused has received ineffective assistance of counsel as a matter of law, and 'reversal is automatic irrespective of a showing of prejudice unless the accused knowingly and intelligently waived his constitutional right to conflict-free representation.'" *Kiker v. State*, 55 So. 3d 1060, 1066 (¶16) (Miss. 2011) (quoting *Armstrong v. State*, 573 So. 2d 1329, 1335 (Miss. 1990)). "Thus, the standard set out in *Strickland* . . . is inapplicable to cases when the defendant's attorney "actively represented conflicting interests." *Id.* (citing *Mickens v. Taylor*, 535 U.S. 162, 166 (2002)). When the trial judge is aware of an actual conflict of interest, "the trial judge should affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant in indicating that he fully understands the nature of the situation and has knowingly and intelligently made the decision to proceed with the challenged counsel." *Littlejohn v. State*, 593 So. 2d 20, 25 (Miss. 1992). "Mere assent in response to a series of questions from the bench may in some circumstances constitute an adequate waiver, but the court should

7

nonetheless endeavor to have each defendant personally articulate in detail his intent to forego this significant constitutional protection." *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir.1975) *abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259, 263 & n.2 (1984). Moreover, "[r]ecord[ing] of the waiver colloquy between defendant and judge will also serve the government's interest by assisting in shielding any potential conviction from collateral attack, either on Sixth Amendment grounds or on a Fifth or Fourteenth Amendment 'fundamental fairness' basis." *Id.*

¶14.  The question presented here is whether, as Durr alleges, Ignatiev had an "actual" conflict of interest. The definition for an "actual conflict" is set out in *Gregory v. State*, 96 So. 3d 54, 57 (¶11) (Miss. Ct. App. 2012):

> Mississippi has applied the Fifth Circuit Court of Appeal's definition of "actual conflict":
>
>> If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.
>
> *Irving v. Hargett*, 518 F. Supp. 1127, 1144 (N.D. Miss.1981) (citing *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979)) . . . . Throughout Gregory's brief, he refers to the conflict of interest as an actual conflict. Yet, Gregory does not explain why the conflict should be labeled an actual conflict.

¶15.  Unlike the defendant in *Gregory*, Durr cites a series of rules and cases to support his conclusion that an "actual" conflict of interest existed under the facts of this case. First, Durr contends that the Forrest County Public Defender's Office falls within the definition of a "firm" found in the Mississippi Rules of Professional Conduct, which states:

> "Firm" or "law firm" denotes a lawyer or lawyers in a partnership, professional corporation, professional association, professional limited liability company, sole proprietorship, governmental agency, or other association whose members are authorized to practice law; or lawyers employed in a legal services

8

organization or the legal department of a corporation or other organization.

Miss. R. Prof. Conduct 1.10 cmt. He then points to the prohibition found in Rule 1.10(a):

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.4.[2]

Miss. R. Prof. Conduct 1.10(a). As a result, Durr argues that the public defender's office should have represented only one of the co-defendants in this case. Because the record does not reflect that he gave "knowing and informed consent after consultation" as required by Rule 1.7(b) and because the trial court failed to address the obvious "actual" conflict of interest on the record as suggested by *Magee*, Durr argues his convictions should be "automatically" reversed and the case remanded for a new trial.

¶16.    The Mississippi cases Durr cites in support of his argument are factually dissimilar. In *Stringer v. State*, 485 So. 2d 274 (Miss. 1986), Stringer retained the same attorney to represent himself, his girlfriend, and his son. *Id*. at 274. They were all charged with capital murder arising out of the same incident. *Id.* Stringer was tried first, and the co-defendants

---

[2] Rule 1.10 is styled: **Imputed Disqualification: General Rule**. The comment to Rule 1.10 states in part: **"Definition of 'firm.'** "For purposes of the Rules of Professional Conduct, the term "firm" includes lawyers in a private firm, and lawyers employed in the legal department of a corporation or other organization. Whether two or more lawyers constitute a firm within this definition can depend on the specific facts . . . . The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm, as is the fact that they have mutual access to confidential information concerning the clients they serve." Miss. R. Prof. Conduct 1.10 cmt. It should be noted Durr cites no Mississippi case where we have ruled that a public defender's office constitutes a "firm" pursuant to these rules. As noted above, there is no information in the record to detail the organization and structure of this particular public defender's office, the relationship between the various attorneys, or any internal operating procedures that may be in place to deal with situations such as the ones in this case.

testified for the defense. *Id.* at 275. The trial court found that Stringer failed to show that there had been an "actual" conflict of interest or that Stringer had been prejudiced by his attorney's joint representation of all three defendants. *Id.* In the present case, Ignatiev did not represent any of the co-defendants. There was no joint representation as there was in *Stringer*.

¶17. Durr also cites *Armstrong v. State*, 573 So. 2d 1329 (Miss. 1990), in which Armstrong and his co-defendant were both charged with armed robbery. *Id.* at 1331. They were both represented by the same public defender. *Id.* They both pled guilty. *Id.* After Armstrong was denied post-conviction relief, the trial court found that an actual conflict existed which resulted in prejudice to Armstrong. *Id.* at 1335. The trial court found that "the public defender neither said nor did anything in mitigation at the sentencing hearing in behalf of either Armstrong or Madkins." *Id*. at 1333. The supreme court held that the trial court erred by appointing the same attorney to represent both defendants "***without first disclosing to them the potential dangers of joint representation by counsel laboring under a conflict***" and without making an inquiry as to whether Armstrong had made a "***knowing and voluntary waiver of his right to conflict-free counsel***." *Id.* at 1334 (emphasis added). The supreme court found this violated Armstrong's Sixth Amendment right to effective assistance of counsel and reversed and remanded for a new sentencing hearing. *Id.* at 1335. Again, the present case is dissimilar because Ignatiev represented only Durr.

¶18. Durr also points to another case from the same circuit court district as this case involving the same public defender. In *Hinton v. State*, 311 So. 3d 1213, 1214 (¶1) (Miss.

10

Ct. App. 2020), Shannon Hinton and Natalie Lett were each charged, in separate indictments, with sex crimes against Hinton's niece. Attorneys from the Forrest County Public Defender's Office were appointed to represent the defendants. *Id.* Ignatiev was appointed to represent Hinton, and Andrew Williams was appointed to represent Lett. *Id.* at (¶4). Prior to trial, Lett entered a guilty plea and was sentenced. *Id.* at (¶6). Part of her plea agreement required her to testify against Hinton. *Id.* at (¶1). Although Hinton knew this information before trial, Hinton raised no issue concerning Ignatiev continuing to represent her at trial. *Id.* at (¶5). She was convicted at trial and appealed her conviction. *Id.* at (¶¶1-2).

¶19.    On direct appeal, for the first time, Hinton argued that she had been denied her constitutional right to effective assistance of counsel. This Court ruled as follows:

> Hinton contends, for the first time on appeal, that she was denied her Constitutional right to effective assistance of counsel. However,
>
> > when a party claims ineffective assistance of counsel for the first time on direct appeal, the Mississippi Supreme Court has stated that "the proper resolution is to deny relief without prejudice to the defendant's right to assert the same claim in a post-conviction relief proceeding," because there is usually inadequate evidence in the trial record to support the claim.
>
> *Colburn v. State*, 990 So. 2d 206, 214 (¶22) (Miss. Ct. App. 2008) (quoting *Willis v. State*, 811 So. 2d 450, 454 (¶8) (Miss. Ct. App. 2001)). Additionally, we would decide such an issue on direct appeal only if
>
> > (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.
>
> *Colenburg v. State*, 735 So. 2d 1099, 1101 (¶5) (Miss. Ct. App. 1999).

In this case, the parties have not stipulated that the record is adequate to allow the appellate court to make a finding on Hinton's constitutional claim of ineffective assistance of counsel. Moreover, our review of the record as it stands before us does not affirmatively show that Hinton's representation was ineffective. However, Hinton ought to be given the opportunity to make a record on this issue in a properly filed application for leave to file a motion for post-conviction relief pursuant to Mississippi Code Annotated section 99-39-7 (Rev. 2015), if she so chooses.

*Hinton*, 311 So. 3d at 1215 (¶¶9-10) (paragraph numbering omitted).

¶20.    Like *Hinton*, Durr has raised the issue of ineffective assistance of counsel for the first time on appeal. The State, in its brief, does not stipulate that the record is sufficient to decide this issue on direct appeal. Durr's appellate counsel recognizes that the record does not indicate whether Durr was informed of any potential prejudice he might suffer as a result of attorneys from the same public defender's office representing him and the other three co-defendants, or whether he waived any such conflict. However, Durr's counsel makes a preemptive argument that there is no need for the record to be more fully developed through a motion for post-conviction collateral relief, as discussed in *Hinton* because there was an obvious "actual" conflict of interest in this case that the circuit judge failed to address on the record. He argues automatic reversal is required.

¶21.    Just as in *Hinton*, we find that the record is inadequate for this Court to decide this issue on direct appeal. Clearly this is not a familiar case where an "actual" conflict of interest exists because one attorney represents multiple defendants with conflicting interests, as suggested by the definition in *Gregory*, 96 So. 3d at 57 (¶11). Instead, Durr relies upon an "Imputed Disqualification" pursuant to Rule 1.10 to contend that the public defenders' office should have represented only one of the co-defendants in this case. This, Durr argues, created

12

an "actual" conflict of interest. However, the comment to that rule itself provides that a determination of the application of the rule depends upon "specific facts of the situation." Miss. R. Prof. Conduct 1.10 cmt.

¶22.　As indicated above, we know nothing about the organization and structure of the Forrest County Public Defenders' Office. We know nothing about the relationship between the various attorneys within the office. We know nothing of the internal operating procedures. We do not know if the various public defenders have a financial interest in cases assigned to another public defender. We do not know if confidential client information is shared among the attorneys. This appears to be a case of first impression as to whether Rule 1.10's imputed disqualification applies to a public defender's office in the same way as it would to members of a private law firm. Further, as noted by Durr in his brief, the record is silent as to whether Durr was informed of any potential, actual, or imputed conflict of interest, or whether he knowingly waived any such conflict. Because we do not have enough of the "specific facts of the situation," we are unable to determine whether Ignatiev had an "actual" conflict of interest by representing Durr under the facts of this case.

¶23.　In an attempt to supply this missing factual information, the dissent relies upon information contained in a report prepared by The Sixth Amendment Center (6AC), a non-partisan, non-profit organization that provides "technical assistance and evaluation services to policymakers and criminal justice stakeholders." Sixth Amendment Center, *The Right to Counsel in Mississippi: Evaluation of Adult Felony Trial Level Indigent Defense Services* (March 2018),

13

https://www.ospd.ms.gov/6AC_mississippi_report_2018%20(Final%20for%20Release).pdf, (last visited May 5, 2023). The record cannot be properly supplemented in this manner. In any event, there are several problems with the information presented in this report.

¶24. First, Mississippi does not have a statewide public defender system, and there are no individual "branches" of such an organization. Instead, each county is responsible to bear the expenses of criminal prosecutions, which includes the payment for attorneys to represent indigent defendants. *See* Miss. Const. art. 14, § 261 (1890); *Bd. of Sup'rs of George Cnty. v. Bailey*, 236 So. 2d 420, 421-22 (Miss. 1970). *Bailey* was decided on June 8, 1970. In that case, the supreme court stated the provisions of section 261 were not "self-executing," and "it requires legislative implementation for the determination of what constitutes proper expenses, the amounts thereof or a method of making such determination, and to whom [the] same should be paid." *Id*. Then, in what appears to be the next legislative session, Mississippi Code Annotated sections 99-15-15, 99-15-17, and 99-15-21 were enacted to take effect on April 5, 1971. 1971 Miss. Laws, ch. 490, §§ 2-4. These sections authorized judges to appoint and pay private attorneys to represent indigent defendants on a case-by-case basis.

¶25. During its 1979 session, the Legislature enacted what became Mississippi Code Annotated sections 25-32-1 through 25-32-19 (effective from and after October 1, 1979). 1979 Miss. Laws, ch. 509, § 1. While not mandatory, these sections provided for the creation of an "office of public defender" in the discretion of the boards of supervisors of the various counties. Miss. Code Ann. § 25-32-1 (Rev. 2018). This office could include a public defender and assistant public defender. Miss. Code Ann. §§ 25-32-1 to -3 (Rev. 2018). These

14

positions could be either full-time or part-time, as should be specified in the order of the board of supervisors which creates the position(s). Miss. Code Ann. § 25-32-1.

¶26. Both of these statutory schemes for the appointment of attorneys to represent indigent defendants are still in effect. As for Forrest County and the attorneys in the present case, no order from the Board of Supervisors is a part of the record, and there is no testimony or affidavit to provide the details of the establishment of a public defender's office and whether the positions are full-time or part-time. As noted above, there is simply insufficient evidence in the appellate record concerning the organizational structure and the operational policies of the office for this Court to decide the issue of ineffective assistance of counsel on direct appeal. The hearsay comments from some public defender to the effect that the office would use the "Chinese wall" process to protect against possible conflicts in representation are not properly before this Court.

¶27. Further, the report is quoted by the dissent as stating, "Forrest County does not have a policy about providing counsel in the event that the . . . public defender office has a conflict." This statement is contradicted by the record in this case. If we assume for the sake of argument that Forrest County has established a public defender's office, the same statute that provided for the court to appoint Durr an additional attorney from outside the public defender's office also covers the situation where all of the public defenders have a conflict. Section 25-32-13, titled "Appointment of counsel by court in conflict of interest cases; appointment of additional counsel where necessary," provides as follows:

> (1) If the court finds that indigent defendants have such conflicts of interests that they all cannot be properly represented by the public defender, or when

15

other good cause is shown in the trial court or on appeal, the court shall appoint separate counsel as provided in Section 99-15-15, Mississippi Code of 1972. In such cases, the fees allowed appointed counsel in Section 99-15-17, Mississippi Code of 1972, shall apply.

(2) If the court finds that an indigent is a defendant in a case of such a nature that he cannot be properly represented by the public defender alone, the court shall appoint additional counsel to assist the public defender as provided in Section 99-15-15, Mississippi Code of 1972. In such cases, the fees allowed appointed counsel in Section 99-15-17, Mississippi Code of 1972, shall apply.

Miss. Code Ann. § 25-32-13 (Rev. 2018). Subparagraph (2) was used in this case to appoint additional counsel for Durr. It is clear that had Durr, his counsel, or the circuit court felt that outside counsel should have been appointed for Durr at the outset, this statute provides the authority for that appointment. There was some conversation concerning the other public defenders having a conflict. With Ignatiev having obtained outside co-counsel due to the conflict of interest with other public defenders, it is reasonable to believe that he had discussed the possible conflict of interest with Durr concerning his own representation in this case. As we stated above, and the dissent acknowledges, the record is silent as to whether Durr waived any conflict that Ignatiev may have had in this case.

¶28. Finally, the dissent points to this Court's decision in *Hinton* where we stated that the question of ineffective assistance of counsel (based upon the exact type of conflict suggested in the present case in the same public defender's office) should be addressed in a motion for post-conviction collateral relief (PCR) so that the record could be more fully developed. *Hinton*, 311 So. 3d at 1215 (¶10). The dissent notes that Hinton subsequently filed a motion with the Mississippi Supreme Court seeking permission to file a PCR motion in the circuit court. The dissent also notes that the supreme court denied the motion to proceed in the trial

16

court because Hinton had not shown she suffered any prejudice as a result of her counsel's possible conflict. Order, *Hinton v. State*, 2021-M-00086 (Miss. 2021). This weighs heavily against Durr's contention that an "actual" conflict of interest exists in this situation. Had the supreme court believed that an "actual" conflict exists, there would have been no need for Hinton to have to show she suffered prejudice. *See Kiker*, 55 So. 3d at 1066 (¶16).

¶29. Just as in *Hinton*, we find that this issue should be dismissed without prejudice to provide Durr the opportunity to later raise the issue in a motion for post-conviction collateral relief.

**II. Did the trial court err by admitting Andre Snell's affidavit as substantive evidence?**

¶30. The State called Andre Snell, one of the co-defendants, to testify at trial against Durr. During direct examination by the State, Snell gave testimony that was inconsistent with his prior affidavit. The State sought to impeach Snell by admitting the affidavit into evidence. The State asked that the affidavit be admitted "as a prior inconsistent statement." The only objection raised by the defense at trial was that the affidavit was hearsay. However, defense counsel seemed to withdraw his objection by stating, "But if they are impeaching him, I think they are entitled to have an exam." In any event, appellate counsel argues for the first time on appeal that the circuit court erred by failing to give a limiting instruction as required by Mississippi Rule of Evidence 105 and by failing to follow the process to properly admit the affidavit pursuant to Mississippi Rule of Evidence 613(b). We will address these issues separately.

**A. Did the trial court err by failing to give a limiting**

17

**instruction pursuant to Rule 105?**

¶31.    Durr's trial counsel did not request a limiting instruction at the time the affidavit was admitted or during the jury instruction conference. Further, the issue was not raised in the motion for a new trial. We have previously addressed the failure to give a limiting instruction in *Lowe v. State*, 333 So. 3d 626, 633 (¶20) (Miss. Ct. App. 2022):

> Lowe also asserts that "the jury was not provided a limiting instruction explaining the proper and improper purposes for which it may consider the evidence." Mississippi Rule of Evidence 105 states:
>
>> If the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, unless expressly waived or rebutted, shall restrict the evidence to its proper scope, contemporaneously instruct the jury accordingly, and give a written instruction if requested.
>
> However, "Rule 105 only requires the judge to offer a limiting instruction, which the defendant is free to 'waive.'" *Curry v. State*, 202 So. 3d 294, 299 (¶16) (Miss. Ct. App. 2016) (citing MRE 105). **In this instance, defense counsel did not request a written limiting instruction. Further, when the trial judge failed to instruct the jury contemporaneously with the admission of the statement, defense counsel did not call the matter to the judge's attention. Had he done so, any error could have been rectified at that time. "A trial judge cannot be put in error on a matter which was not presented to him for decision."** *Reynolds v. State*, 913 So. 2d 290, 300 (¶37) (Miss. 2005). We further find the absence of any limiting instruction by the court did not deprive Lowe of a fair trial. *See Curry*, 202 So. 3d at 299 (¶16) (recognizing **"that the erroneous denial of a limiting instruction is harmless error unless it deprives the defendant of a fair trial"**) (citing *Robinson v. State*, 940 So. 2d 235, 239 (¶11) (Miss. 2006)). Therefore, we find this argument is without merit.

(Emphasis added). The circuit court, as requested by the State, admitted Snell's affidavit for impeachment purposes pursuant to Mississippi Rule of Evidence 613(b). As a result, pursuant to Mississippi Rule of Evidence 105, Durr would have been entitled to an

18

instruction limiting the jury's use of the affidavit to impeachment purposes only. However, as in *Lowe*, Durr made no request for a limiting instruction concerning Snell's affidavit. As a result, this issue was not properly preserved for appeal. However, we will address this matter in a plain-error analysis below.

### B.   Was Snell's affidavit  properly admitted pursuant to Rule 613(b)?

¶32.   Durr's trial counsel did not object to Snell's affidavit being admitted for impeachment purposes pursuant to Rule 613(b). Accordingly, this issue is not properly before the Court on appeal. In any event, citing *Portis v. State*, 245 So. 3d 457, 470-71 (¶32) (Miss. 2018), appellate counsel argues that before Snell's affidavit could be properly admitted, the trial court should have first determined whether the prior statement was inconsistent with Snell's trial testimony. The record is clear that the circuit judge read the affidavit and found that it was inconsistent with Snell's testimony before admitting the affidavit as a prior inconsistent statement pursuant to Rule 613(b).

¶33.   Next, Durr argues on appeal that the trial court should have conducted a "balancing test" pursuant to Mississippi Rule of Evidence 403 before admitting the affidavit. Again, however, trial counsel did not request that the circuit court consider Rule 403. In *Thames v. State*, 310 So. 3d 1163, 1170 (¶35) (Miss. 2021), the supreme court held:

> Because Thames did not object at trial to the State's use of Lofton's prior inconsistent statements (sworn or unsworn) or request a Rule 105 limiting instruction or a Rule 403 balancing test, **the issue is barred from review absent plain error.** *Roby v. State*, 183 So. 3d 857, 870-71 [(¶55)] (Miss. 2016). "To preserve an issue for appeal, a contemporaneous objection must be made." *Walker v. State*, 913 So. 2d 198, 238 (Miss. 2005) (citing *Ratliff v. State*, 313 So. 2d 386 (Miss. 1975)); *see also Pitchford v. State*, 45 So. 3d 216,

19

238-39 (Miss. 2010) (failure to raise a Rule 403 objection at trial bars the issue from review) . . . .

(Emphasis added). While these issues have not been properly preserved for appellate consideration, we will consider the issues below under a plain-error analysis.

> **C.** **Did the trial court commit plain error by admitting Snell's affidavit pursuant to Rule 613(b) without sua sponte conducting a balancing test pursuant to Rule 403 and without sua sponte giving a limiting instruction pursuant to Rule 105?**

¶34. We discussed the standard to be used in a plain-error analysis in *Bridges v. State*, 301 So. 3d 689, 694 (¶18) (Miss. Ct. App. 2020):

> The plain-error doctrine allows our appellate courts to "recognize obvious error which was not properly raised by the defendant on appeal, and which affects a defendant's 'fundamental, substantive right.'" *Smith v. State*, 986 So. 2d 290, 294 (¶10) (Miss. 2008) (quoting *Debrow v. State*, 972 So. 2d 550, 553 (¶10) (Miss. 2007)). "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Hall v. State*, 201 So. 3d 424, 428 (¶12) (Miss. 2016) (internal quotation marks omitted). "[I]n order to determine if plain error has occurred, **we must determine if the trial court has deviated from a legal rule**, **whether that error is plain, clear, or obvious**, and **whether the error has prejudiced the outcome of the trial.**" *Pinter v. State*, 221 So. 3d 378, 384 (¶12) (Miss. Ct. App. 2017) (quoting *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016)).

(Emphasis added). Therefore, we will review each of the three prerequisites to a finding of plain error.

> **i.** **Did the trial court deviate from a legal rule?**

¶35. The trial court admitted Snell's affidavit for impeachment purposes pursuant to Rule 613(b). Because the court admitted the affidavit for this limited purpose, a limiting instruction would have been appropriate under Rule 105, which states:

> If the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, unless expressly waived or rebutted, shall restrict the evidence to its proper scope, contemporaneously instruct the jury accordingly, and give a written instruction if requested.

MRE 105. Although Durr did not request a limiting instruction, there is nothing in the record to suggest that he "expressly waived" the giving of such an instruction. It is fair to say that the trial court's failure to give a proper limiting instruction did deviate from a legal rule in this regard.

¶36.    Durr also contends that before Snell's affidavit was admitted into evidence, the circuit court should have conducted a "balancing test" under Rule 403 which provides:

> *The court **may** exclude relevant evidence* if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

(Emphasis added). Rule 403 does not place the burden upon the circuit court to sua sponte conduct the balancing test. Instead, in *Middleton v. State*, 281 So. 3d 858, 862 (¶14) (Miss. Ct. App. 2019), this Court reasoned:

> Further, Middleton never requested a Rule 403 balancing test, and it is his duty to do so. "[T]he onus [is] on the parties" to request the trial court perform the test "with regard to relevant evidence which may otherwise be excluded . . . ." *McLaurin v. State*, 31 So. 3d 1263, 1270 (¶31) (Miss. Ct. App. 2010). Accordingly, this issue is without merit.

We find that the trial court did not deviate from the requirements of Rule 403 by failing to sua sponte perform an "on the record" balancing test. The plain-error analysis of this contention stops here.

### ii.    Was the trial court's failure to sua sponte give

21

**a limiting instruction pursuant to Rule 105 a**
**"plain, clear or obvious" error?**

¶37.    While we noted above that Rule 105 places upon the trial judge the responsibility to give a limiting instruction in the appropriate circumstances, absent an express waiver of the instruction, a trial court's failure to do so is not always "plain, clear or obvious" error. In *Curry*, 202 So. 3d at 301 (¶24), this Court explained:

> We presume that counsel's decision not to request a limiting instruction was within the ambit of trial strategy. *See, e.g.*, *Herrington v. State*, 102 So. 3d 1241, 1246 (¶18) (Miss. Ct. App. 2012). This presumption is appropriate given that, as discussed above, such an instruction has the potential to do the defendant more harm than good. *See id.*

Trial counsel's decision not to draw any more attention to Snell's affidavit by requesting a limiting instruction would have been undercut had the circuit court, sua sponte, given such an instruction. We cannot say that the circuit court's decision not to give the limiting instruction without a specific request by Durr's counsel was obvious error.

### iii.    Did the trial court's failure to sua sponte give a limiting instruction pursuant to Rule 105 prejudice the outcome of the trial?

¶38.    The State argues on appeal that Durr suffered no prejudice as a result of the failure to give a limiting instruction regarding Snell's affidavit. The State points out that both Snell and Hinton's testimony at trial, as well as Durr's pre-trial statement to law enforcement that was admitted into evidence at trial, all confirm that all three of them knowingly went to the residence of Owens and Jones for the purpose of robbing them. The evidence shows that Snell and Durr were armed and that Jones died from gunshot wounds inflicted during the robbery, and that Owens was also wounded during the robbery. In *Robinson*, 940 So. 2d at

22

239 (¶11), the supreme court held that the failure to give a limiting instruction concerning a statement that should have been admitted for impeachment purposes was harmless only when there was other evidence of the matters contained in the statement.

¶39. We find that there was substantial evidence to support Durr's convictions without consideration of Snell's affidavit and that Durr was not prejudiced by the failure of the trial court to sua sponte give a limiting instruction concerning Snell's affidavit.[3]

**CONCLUSION**

¶40. We affirm Durr's convictions and sentences, and we dismiss Durr's claim of ineffective assistance of counsel without prejudice to his opportunity to raise it in a motion for post-conviction collateral relief.

¶41. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.**

**WESTBROOKS, J., DISSENTING:**

¶42. Tykevious Durr argues on appeal that his Sixth Amendment right to effective assistance of counsel was violated when public defenders from the same county's office

---

[3] While it is clear that the State offered the affidavit into evidence as a prior inconsistent statement and that the circuit court admitted the affidavit as such for the purpose of impeachment, the affidavit may well have been admissible as substantive evidence pursuant to Mississippi Rule of Evidence 801(d)(1)(A). The record shows that Snell verified under oath at his guilty plea hearing that the affidavit was true and correct and Snell was available for cross-examination about the affidavit at trial. Had the affidavit been admitted under this provision, it would not have been hearsay, and no limiting instruction pursuant to Rule 105 would have been required.

23

represented both him and his two co-defendants who testified against him in a criminal matter. Because I disagree with the majority's contention that this matter should be resolved through post-conviction collateral relief proceedings and instead would resolve Durr's claim on direct appeal, I must respectfully dissent.

## FACTS

¶43. In September 2020, Durr and two co-defendants (Andre Snell and Tomaz Hinton), were indicted for conspiracy to commit armed robbery, capital murder, armed robbery, and aggravated assault. The charges stemmed from an altercation between two groups of people that later escalated into deadly violence. According to testimony, late in the evening or in the early morning hours of November 26-27, 2018, Durr, Hinton, and Snell returned to a residence where a prior altercation took place and opened fire on the victims. Tomaka Jones was fatally shot, and Marlena Owens was seriously injured. Owens later testified that she saw a person stand over Jones after he had fallen into a bathtub and shoot Jones. She could not identify which person was the shooter but noticed that he was wearing striped Adidas pants. The culprits took Owens' cell phone before leaving. At approximately 1:45 on the morning of November 27, 2018, Durr was arrested while wearing striped Adidas pants. A pair of black and white striped Adidas pants was found in the car Snell was arrested in.[4] Hinton's arrest photo shows him attired in a black and white striped Adidas tracksuit jacket. His pants are not photographed. Hinton and Durr each placed the blame on the other for shooting Jones in the bathtub.

---

[4] Specifically, Snell was found "half in and out of the vehicle" "standing in between the open driver's door and the seal of the front driver's door."

24

¶44. Durr, Hinton, and Snell were each appointed one of Forrest County's four full-time public defenders. Hinton and Snell each pled guilty to lesser charges[5] and testified against Durr at trial. Both co-defendants pointed to Durr as Jones' shooter. The jury convicted Durr of all four charges. Durr was sentenced to life imprisonment without eligibility for parole for capital murder, twenty-five years for armed robbery, twenty years for aggravated assault, and five years for conspiracy to commit armed robbery. The sentences were set to run consecutively. After the denial of his motion for judgment notwithstanding the verdict, Durr timely appealed. On appeal, Durr claims for the first time that his Sixth Amendment right was violated when public defenders from the same office represented both him and his co-defendants (Hinton and Snell) who ultimately testified against him.[6] I agree and under plain error review would reverse the judgment and remand Durr's case for a new trial with conflict-free counsel.

**DISCUSSION**

¶45. Durr asks the appellate court to review for the first time on appeal that he received ineffective assistance of counsel in violation of the Sixth Amendment. Durr contends that Durr, Snell, and Hinton's representation by the Forrest County Public Defender's office runs afoul of "the most basic principle of fairness."

---

[5] Hinton pled guilty to armed robbery. The court entered an order to nolle prosequi Hinton's remaining charges of conspiracy to commit armed robbery, capital murder, and aggravated assault. Snell testified that he pled guilty to second-degree murder and that part of his plea required him to testify.

[6] Although Durr brings two issues on appeal, I address only the first because I find it is dispositive.

¶46.    "When a defendant's substantive or fundamental rights are affected, this Court will notice a plain error not identified or distinctly specified." *Pace v. State*, 242 So. 3d 107, 115 (¶20) (Miss. 2018) (internal quotation mark omitted) (citing M.R.A.P. 28(a)(3); *Foster v. State*, 148 So. 3d 1012, 1018 (¶20) (Miss. 2014)). "When an error impacts a fundamental right of the defendant, 'procedural rules give way to prevent a miscarriage of justice,' requiring this Court to address issues on plain-error review and correct any fundamental violations." *Stevenson v. State*, 320 So. 3d 1225, 1229 (¶12) (Miss. 2021) (citing *Cozart v. State*, 226 So. 3d 574, 581 (¶22) (Miss. 2017)). "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Garcia v. State*, 300 So. 3d 945, 976 (¶104) (Miss. 2020) (citing *Ambrose v. State*, 254 So. 3d 77, 136 (Miss. 2018)).

¶47.    Both our constitution and the United States Constitution guarantee a right to effective assistance of counsel in criminal trials. Miss. Const. art. 3, § 26; U.S. Const. amend. VI & XIV; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "The Sixth Amendment right to counsel protects a defendant's 'fundamental right to a fair trial.'" *Galloway v. State*, 298 So. 3d 966, 978 (¶62) (Miss. 2020) (Kitchens, P.J., dissenting) (citing *Strickland v. Washington*, 466 U.S. 668, 684 (1984)). "The 'right to counsel, conflict free, is attendant to the Sixth Amendment right to effective assistance of counsel.'" *Id*. (quoting *Armstrong v. State*, 573 So. 2d 1329, 1334 (Miss. 1990)). Additionally, our Supreme Court has previously analyzed ineffective assistance of counsel claims under plain error review on direct appeal in the past. *Morrow v. State*, 275 So. 3d 77, 81, 83-85 (¶¶15, 23-28) (Miss. 2019). Under a plain error

analysis, it is evident from the record in this case that a grave miscarriage of justice has occurred.

## I.  Constitutional Framework

¶48.    The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal trial the right "to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  The Sixth Amendment makes this guarantee because the assistance of counsel is "necessary to ensure that the trial is fair." *Strickland*, 466 U.S. at 685.  The Supreme Court has further explained that "the right to counsel is the right to the effective assistance of counsel." *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14, (1970)).  And the right to conflict-free representation is encompassed by the right to effective assistance of counsel that the Sixth Amendment guarantees.  *Stringer v. State*, 485 So. 2d 274, 275 (Miss. 1986) (citing *Glasser v. United States*, 315 U.S. 60, 62 (1942), *superseded on other grounds as recognized in Bourjaily v. United States*, 483 U.S. 171 (1987)).  This right applies against the states through the Fourteenth Amendment.  *Gideon v. Wainwright*, 372 U.S. 335, 340, 345 (1963).

¶49.    "Effective representation is lacking, however, if counsel, unknown to the accused and without his knowledgeable assent, is in a duplicitous position where his full talents as a vigorous advocate having the single aim of acquittal by all means fair and honorable are hobbled or fettered or restrained by commitments to others." *United States v. Alvarez*, 580 F.2d 1251, 1254 (5th Cir. 1978) (quoting *Porter v. United States*, 298 F.2d 461, 463 (5th Cir. 1962)).  "Undivided loyalty and fidelity of commitment is therefore the guiding principle in

this important area of Sixth Amendment jurisprudence." *Id.* An attorney's duty of loyalty to a client is "perhaps the most basic" responsibility of counsel, but "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland*, 466 U.S. at 692.

¶50. An ineffective assistance of counsel claim is typically analyzed under the two prongs of *Strickland*, which instructs that "[t]he test to be applied in cases involving alleged ineffectiveness of counsel is whether counsel's over-all performance was (1) deficient and if so, (2) whether the deficient performance prejudiced the defense." *McQuarter v. State*, 574 So. 2d 685, 687 (Miss. 1990) (citing *Strickland*, 466 U.S. at 687). But "the standard set out in *Strickland* . . . is inapplicable to cases when the defendant's attorney 'actively represented conflicting interests.'" *Kiker v. State*, 55 So. 3d 1060, 1066 (¶16) (Miss. 2011) (quoting *Mickens v. Taylor*, 535 U.S. 162, 166 (2002)). In analyzing an ineffective assistance claim that presents a conflict of interest, we do not apply the *Strickland* two-pronged test but rather a more lenient standard that does not require a showing of prejudice. *See id.*; *Holloway v. Arkansas,* 435 U.S. 475, 489-90 (1978); *Glasser*, 315 U.S. at 75-76; *Galloway*, 298 So. 3d at 975 (¶¶44-46). In *Holloway v. Arkansas*, the Court created an automatic-reversal rule "where defense counsel is forced to represent codefendants over [a co-defendant's] timely objection, unless the trial court has determined that there is no conflict." *Mickens*, 535 U.S. at 168 (citing *Holloway*, 435 U.S. at 488). But in cases where no objection to the conflict of interest stemming from multiple representation was raised, the

28

Supreme Court has established the *Cuyler* standard.[7] *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). The *Cuyler* standard states that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.*[8]

## II. Mississippi Law

¶51. With this Constitutional framework in place, I turn to Mississippi law. In *Stringer*, our Supreme Court acknowledged that it "readily recognizes the rule that effective assistance of counsel encompasses the right to representation by an attorney who does not owe conflicting duties to other defendants as set forth in *Glasser v.* [*United States*]. . . ." *Stringer*, 485 So. 2d at 275. The Supreme Court has noted that "adept representation encompasses two broad principles: minimum competence and loyal assistance." *Armstrong*, 573 So. 2d at 1331. We have noted that "guarantees of due process of law require undivided loyalty of defense counsel" and that "[u]nder our system of jurisprudence, if a lawyer is not one hundred percent loyal to his client, he flunks." *Littlejohn v. State*, 593 So. 2d 20, 22-23 (Miss. 1992).

---

[7] Some courts refer to the case as the *Sullivan* (instead of the *Cuyler*) standard. *See Mickens*, 535 U.S. at 168; *Russeau v. Stephens*, 559 F. App'x 342, 357 (5th Cir. 2014) (unpublished).

[8] Federal courts have limited the *Cuyler* standard to apply solely to cases that have conflicts of interest resulting from multiple representations of criminal defendants, not cases that involve counsel's personal conflicts. *See Beets v. Scott*, 65 F.3d 1258, 1268, 1270-71 (5th Cir. 1995); *United States v. Garza*, 429 F.3d 165, 171 (5th Cir. 2005); *United States v. Caston*, No. 3:05cr153-TSL-JSC, 2007 WL 9724360, at *2 n.2 (S.D. Miss. Oct. 29, 2007); *Jordan v. Epps*, No. 3:09cv544-DPJ-FKB, 2012 WL 5997024, at *2 (S.D. Miss. Nov. 30, 2012).

¶52. Mississippi has readily adopted the *Cuyler* standard as an alternative to *Strickland* when "an actual conflict of interest adversely affected his lawyer's performance." *Galloway*, 298 So. 3d at 974-75 (¶¶43-45). In addition, the Mississippi Supreme Court in *Kiker* has added an additional protection to *Cuyler*'s lowered bar. *Kiker*, 55 So. 3d at 1066 (¶16). In that case, the Supreme Court stated, "When the accused is represented by an attorney with an actual conflict of interest, the accused has received ineffective assistance of counsel as a matter of law, and 'reversal is automatic irrespective of a showing of prejudice unless [the accused] knowingly and intelligently waived his constitutional right to conflict free representation.'" *Id*. (quoting *Armstrong*, 573 So. 2d at 1335). According to Justice Kitchens, who authored *Kiker*, this means that when an actual (as opposed to potential) conflict has been shown, "[u]nlike *Cuyler*, our standard, as set out in *Kiker*, does not require a showing that the attorney's performance was adversely affected by the conflict of interest, but it requires only a showing that an actual conflict of interest exists." *Galloway*, 298 So. 3d at 979 (¶64) (Kitchens, J., dissenting).

¶53. Mississippi has created multiple professional rules of conduct designed to prevent conflicts of interest. First, Mississippi Rule of Professional Conduct 1.7(b)[9] states:

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless the lawyer reasonably believes:
> (1) the representation will not be adversely affected; and
> (2) the client has given knowing and informed consent after

---

[9] The comments to Rule 1.7 state that "[s]imultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph (b)." Miss. R. Prof. Conduct 1.7 cmt.

> consultation. The consultation shall include explanation of the implications of the representation and the advantages and risks involved.

The comments to this rule state that "[a]n impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, [or] incompatibility in positions in relation to an opposing party." Miss. R. Prof. Conduct 1.7 cmt.

¶54. "It is well-settled that requiring or permitting one attorney to represent co-defendants, commonly referred to as joint representation, is not per se violative of the constitutional guarantees of effective assistance of counsel." *Armstrong*, 573 So. 2d at 1333 (citing *Burger v. Kemp*, 483 U.S. 776, 783 (1987)). But the United States Court of Appeals for the Fifth Circuit has explained that "a conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing." *Foxworth v. Wainwright*, 516 F.2d 1072, 1076, 1080 (5th Cir. 1975). And according to our rules, "[t]he potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one co-defendant." Miss. R. Prof. Conduct 1.7 cmt. "Moreover, '[s]uch representation not only constitutes a breach of professional ethics, it also invites disrespect for the integrity of the Court.'" *Armstrong*, 573 So. 2d at 1332-33 (quoting *Wheat v. United States*, 486 U.S. 153, 162 (1988)).

¶55. Next, Mississippi Rule of Professional Conduct 1.10(a) imputes the aforementioned conflicts to firms:

31

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.4.

Thus, the first key to this issue is answering the question of whether an individual county's public defender's office constitutes a "firm" for the purposes of the conflicts of interest rules.

### III. A "firm" may exist within Mississippi's public defender system.

¶56. As the majority states, Mississippi has not yet answered the question of whether an individual county's public defender's office constitutes a "firm." *Ante* at ¶22. Many other states have already grappled with this decision. *See, e.g.*, *Rodriguez v. State*, 628 P.2d 950 (Ariz. 1981); *Nelson v. State*, 440 P. 3d 240 (Alaska 2019); *Duvall v. State*, 923 A.2d 81, 95 (Md. 2007); *Asch v. State*, 62 P.3d 945 (Wyo. 2003); *State v. Bell*, 447 A.2d 525 (N.J. 1982). The comments to the Mississippi Rules of Professional Conduct define a "firm" as "lawyers in a private firm, and lawyers employed in the legal department of a corporation or other organization." Miss. R. Prof. Conduct 1.10 cmt. The comments note that whether two or more lawyers constitute a firm can depend on specific facts and that the purpose of the rule must be considered when determining whether a firm exists. *Id*. "A group of lawyers could be regarded as a firm for purposes of the rule that the same lawyer should not represent opposing parties in litigation, while it might not be so regarded for purposes of the rule that information acquired by one lawyer is attributed to another." *Id*. While silent on the classification of public defender's offices, the comments specifically note that "[l]awyers employed in the same unit of a legal service organization constitute a firm, but not necessarily those employed in separate units." *Id*.

32

¶57. As the majority states, information about the organization and structure and composition of public defenders' offices can be difficult to find. *Ante* at ¶22. One excellent resource is a 2018 report published by the Mississippi Office of State Public Defender on its website.[10] This report gives us some insight into how public defender offices across the state operated at the time of the report. The majority mistakenly suggests that we offer this report as a supplement to the record. *Ante* at ¶23. This is not the case. Instead, we offer this report as a secondary source as part of our research and analysis. This report gives some background information into the structure of public defender offices in Mississippi that was not otherwise supplied by the majority.

¶58. According to the Sixth Amendment Center, as of 2018, seven of Mississippi's eighty-two counties have established a public defender's office: Forrest, Harrison, Hinds, Jackson, Lamar, Pearl River, and Washington Counties. *The Right to Counsel In Mississippi*, *supra* ¶57 n.10, at 19 n.73.[11] In the counties that have established public defender offices, an attorney is selected to serve as the public defender, and that attorney is responsible for hiring

---

[10] Sixth Amendment Center, *The Right to Counsel in Mississippi: Evaluation of Adult Felony Trial Level Indigent Defense Services*, at 19 (March 2018), https://www.ospd.ms.gov/6AC_mississippi_report_2018%20(Final%20for%20Release).pdf (last visited May 5, 2023).

[11] In the remaining counties that have not established a county-funded public defender office, the circuit court judge appoints an attorney to represent the indigent defendant. *Id*. at 23. Attorneys may be appointed at an hourly rate or a fixed fee. *Id*. In hourly rate systems, private attorneys are typically paid an hourly rate for their work, plus expenses. *Id*. at 24. In an "appointed counsel fixed-fee system" an appointed attorney is paid a fixed salary to represent an unlimited number of felony defendants. *Id*. at 25. According to the Sixth Amendment Center, "appointed counsel fixed fee systems" are colloquially referred to as a "part-time public defender office." *Id*. at 26.

assistant public defenders if authorized by the county. *Id*. The county is required to provide "office space, secretarial assistance, and all reasonable expenses of operating the office." *Id*. (citing Miss. Code Ann. § 25-32-7 (Supp. 2017)).

¶59. In 2018, Forrest County had a full-time public defender's office with one full-time public defender and three full-time assistant public defenders. *Id*. at 20. According to the Sixth Amendment Center's research, Forrest County's circuit court judges jointly select the public defender. *Id*. The public defender, with the approval of the circuit court judges, makes hiring decisions in the office. *Id*. The four full-time public defender's office attorneys do not engage in private practice. *Id*. According to the Sixth Amendment Center, "Forrest County does not have a policy about providing counsel in the event that the . . . public defender office has a conflict." *Id*. The Sixth Amendment Center report states that "[t]he public defender believes the office attorneys will not be allowed to withdraw from representing any of the indigent defendants in a multi-defendant case and plans to use a 'Chinese Wall' procedure to shield each attorney from having access to the cases of the other office attorneys." *Id*. The report notes that other public defender offices appoint a private attorney when the public defender office has a conflict. *Id*. at 21-22.

¶60. Durr asks us on direct appeal to answer the legal question of whether individual public defender offices fall under the definition of a "firm" for the purposes of conflict prevention as contemplated in the Mississippi Rule of Professional Conduct 1.10. The Restatement (Third) of the Law Governing Lawyers section 123 (2000) agrees with his position, and so do I. The Restatement notes that "[w]here a lawyer's relationship with a client creates an

34

incentive to violate an obligation to another client, an affiliated lawyer will often have [a] similar incentive to favor one client over the other." Restatement (3d) of the Law Governing Lawyers § 123 cmt. (b). The Restatement then specifically lists public-defender offices when discussing the imputation of a conflict of interest to an affiliated lawyer, explaining that

> [i]n a public-defender office, conflict-of-interest questions commonly arise when the interests of two or more defendants so conflict that lawyers in a private-practice defense firm could not represent both or all the defendants (see § 129). The rules on imputed conflicts and screening of this Section apply to a public-defender organization as they do to a law firm in private practice in a similar situation.

*Id*. at cmt. (d)(iv).

¶61.　The majority believes that Durr's issue of ineffective assistance of counsel would be best heard on a motion for post-conviction collateral relief so that the record in the case can be more thoroughly developed. *Ante* at ¶20. Indeed, "generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Williams v. State*, 228 So. 3d 949, 952 (¶12) (Miss. Ct. App. 2017) (citing *Dartez v. State*, 177 So. 3d 420, 422-23 (¶18) (Miss. 2015)). But this Court will also review such claims on direct appeal if "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.'" *Id*. Furthermore, "if the defendant is represented by counsel who did not represent him at trial, and the facts supporting the claim are fully apparent from the appellate record, the Court may

address the issue." *Pace*, 242 So. 3d at 118 (¶28) (citing M.R.A.P. 22(b)).[12] Here, we clearly have a case that carries questions of constitutional dimensions. We also have a factual scenario from the record where two co-defendants represented by the same public defender's office testify in direct opposition—each stating the other shot the victim—which is a direct actual conflict. Consequently, this Court can and should address this issue on direct appeal.

¶62. Furthermore, this Court, at a minimum, can choose to answer the legal question of whether an individual county's public defender's office constitutes a "firm" for purposes of claims of ineffective assistance of counsel—as many other states have done on direct appeal. *See, e.g., State v. Ibarra*, 829 N.W.2d 190, 2013 WL 530558, at *8 (Iowa Ct. App. 2013) (finding on direct appeal that a conflict exits between public defenders within the same office, although this particular defendant waived any possible conflict on the record); *Perkins v. State*, 487 S.E.2d 365, 368 (Ga. Ct. App. 1997) (holding on direct appeal for purposes of ineffective assistance claims "public defenders in the same office are treated as members of a law firm"); *State v. Mark*, 231 P.3d 478, 518 (Haw. 2010) (declining on direct appeal to impute per se conflicts of interest to lawyers working in the same public defender's office); *State v. Cook*, 171 P.3d 1282, 1292 (Idaho Ct. App. 2007) (holding, on direct appeal, that conflict questions that arise in public defender's office should be addressed on a "case-by-case basis"). This question needs to be answered irrespective of the individual outcome of

---

[12] Mississippi Rule of Appellate Procedure 22(b) also notes that "[w]here the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings."

this case.

¶63.    The majority points to *Hinton v. State*, 311 So. 3d 1213 (Miss. Ct. App. 2020),[13] to support its determination that this issue is best reserved for a post-conviction collateral relief motion. *Hinton* is a factually similar case. In that case, attorneys from the same public defender's office as in the present case (Forrest County) represented multiple co-defendants in a criminal matter. *Hinton*, 311 So. 3d at 1214-15 (¶¶4-7). Just like in Durr's case, Hinton's co-defendant entered a plea and testified against her. *Id*. at (¶¶6-7). Just like Durr, Hinton first raised the issue of a violation of her Sixth Amendment right to counsel due to multiple representations by public defenders from the same office in her appeal. *Id*. at 1214 (¶1). In *Hinton*, this Court declined to address Shannon Hinton's constitutional claim of ineffective assistance of counsel so that Hinton could be "given the opportunity to make a record on this issue in a properly filed application for leave to file a motion for post-conviction relief . . . ." *Id*. at 1215 (¶10). At the time, I concurred with the decision in *Hinton*. But the ultimate outcome of Hinton's case has convinced me that a different ruling is necessary.

¶64.    As instructed by this Court, Hinton petitioned the Mississippi Supreme Court for leave to proceed in the trial court on a motion for post-conviction collateral relief. Motion, *Hinton v. State*, No. 2021-M-00086-SCT (Miss. Jan. 25, 2021). Hinton's request was denied by a Supreme Court panel, which found "that Hinton has failed to show any prejudice under the *Strickland v. Washington* standard and that this claim is without merit." Order, *Hinton v.*

---

[13] The appellant in that case is Shannon Hinton, not Tomaz Hinton, who is Durr's co-defendant in the present case.

37

*State*, No. 2021-M-00086-SCT (Miss. Apr. 6, 2021). The majority speculates that the Supreme Court's decision in *Hinton* weighs heavily against Durr's contention that an "actual" conflict exists because the Supreme Court would not have required Hinton to show prejudice had an actual conflict been present. *Ante* at ¶28. This conjecture is incorrect. There is no more fundamental "actual" conflict than for one client to testify against the interests of the first client with information that directly contradicts the first client's own testimony. This is the most basic conflict possible. As it stands, Hinton remains incarcerated to this day with no recourse. I do not believe this outcome is what this Court envisioned when we determined that Hinton could seek redress in a motion for post-conviction collateral relief. Because of the end result in Hinton's case, I do not agree with the majority's decision to dismiss this issue without prejudice for Durr to raise the issue in a motion for post-conviction collateral relief. *Ante* at ¶29. I would address this issue on direct appeal as presented.

¶65. Even with "Chinese Wall" safeguards in place, it is not difficult to contemplate what potential conflicts could arise in a shared office space when all the attorneys present are representing separate co-defendants. And the demands and requirements of the Sixth Amendment call for more protection than a metaphorical Chinese Wall. In small office spaces it can be difficult to operate without overhearing phone calls or conversation, or seeing the contents of another attorney's computer screen. Additionally, the Public Defender manages the handling of cases in his/her office. Any assistant public defender falls under that person's authority, which makes a conflict foreseeable. In a hierarchical office structure

38

where hiring, firing, promotion, and discipline matters are at play, these determinations could impact a public defender's decisions in a case.[14] To avoid a conflict of interest in a firm, the defendant's interests must be aligned with his co-defendant's in order for multiple representation of co-defendants to pass muster. In the interest of safeguarding the duty of loyalty constitutionally owed to every defendant, I would hold that each county's individual office of the public defender should be considered a "firm" for conflict-of-interest purposes.

### IV. An "actual conflict" existed during Durr's trial.

¶66. In addition to resolving the question of whether a public defender's office is a "firm" for conflict-of-interest purposes, I would also find that in Durr's individual case, an "actual conflict" existed when multiple public defenders from the Forrest County Public Defender's office represented Durr and his co-defendants who pled guilty to lesser charges and testified against him.[15] Because Durr did not object to the conflict of interest at the trial level, his case would be analyzed under the *Cuyler* standard, which requires "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348.

¶67. This Court has defined an "actual conflict" as existing when:

[A] defense attorney owes duties to a party whose interests are adverse to those

---

[14] *See generally* Lawrence J. Fox & Daniel T. Goyette, *National Association for Public Defense (NAPD) Formal Ethics Opinion 19-1* (May 2020), https://www.publicdefenders.us/files/NAPD%20Ethics%20Opinion_19-1_FINAL.pdf (last visited May 5, 2023).

[15] Because I believe Durr's conviction should be reversed and the case remanded due to the conflict of interest, I do not discuss Durr's second issue regarding the admission of Snell's affidavit.

39

of the defendant, then an actual conflict exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client."

*Gregory v. State*, 96 So. 3d 54, 57 (¶11) (Miss. Ct. App. 2012) (citing *Irving v. Hargett*, 518 F. Supp. 1127, 1144 (N.D. Miss. 1981)). Mississippi district courts have cited the Fifth Circuit to say that an actual conflict arises "when the defense attorney places himself in a situation inherently conducive to divided loyalties." *Irving*, 518 F. Supp. at 1143 (quoting *United States v. Kranzthor*, 614 F.2d 981, 983 (5th Cir. 1980) (citing *United States v. Medel*, 592 F.2d 1305, 1310 (5th Cir. 1979) (explaining an actual conflict is "some divergence in the parties' interests"))). The Fifth Circuit has also stated that "a conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing." *Id.* at 1144 (quoting *Foxworth*, 516 F.2d at 1076).

¶68. In the present case, an "actual conflict" exists because Durr's co-defendants were represented by public defenders from the same "firm" as his attorney and testified against him. There is no doubt that co-defendants testifying against one another represents an actual conflict because in that scenario, their interests are diametrically opposed. The adverse effect, of course, was that Durr was convicted based on the testimony of his co-defendants. But regardless of whether Durr showed an adverse effect, under *Kiker* "[w]hen the accused is represented by an attorney with an actual conflict of interest, the accused has received ineffective assistance of counsel as a matter of law," and reversal is automatic unless the conflict was waived. *Kiker*, 55 So. 3d at 1066 (¶16). Nothing in the record indicates such

40

a waiver occurred. Because Durr has shown that an actual conflict of interest adversely affected his lawyer's performance as required, I would reverse the judgment in Durr's case and remand his case for a new trial.

*  *  *  *  *

¶69.   "[The] difficulty in assessing prejudice resulting from a conflict of interest is due in part to the fact that the conflict may affect almost any aspect of the lawyer's preparation and presentation of the case." *Burger*, 483 U.S. at 800 (Blackmun, J., dissenting). "Because the conflict primarily compels the lawyer not to pursue certain arguments or take certain actions, it is all the more difficult to discern its effect." *Id.*  In accordance with this reasoning, I would find that there is no need to await a fact-finding post-conviction hearing to resolve the issues in this case. I would hold that each individual county's public defender's office should be considered a "firm" for the purpose of conflicts of interest. I would also hold that Durr's case, even based on the limited facts before us, demonstrates an actual conflict that adversely affected his attorney's performance in violation of Durr's Sixth Amendment right, requiring a reversal of the judgment and entitling Durr to a new trial. As a consequence, I must respectfully dissent.

**McDONALD, J., JOINS THIS OPINION.**